**MISSOURI SOYBEAN ASSOCIATION, et al., Appellants,**

v.

**THE MISSOURI CLEAN WATER COMMISSION, et al., Respondents.**

No. SC 84336.

Supreme Court of Missouri, En Banc.

April 22, 2003.

Alok Ahuja, Terry J. Satterlee, John A. Felton, Kansas City, for Appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Timothy P. Duggan, Asst. Atty. Gen., William H. Bryan, Asst. Atty. Gen., Jefferson City, for Respondents.

LAWRENCE E. MOONEY, Sp. Judge.

The appellants, several trade and business associations,[1] challenge a decision by the Missouri Clean Water Commission (Commission) to include the Missouri and Mississippi Rivers (Rivers) on the State's 1998 impaired waters list that is submitted to the Environmental Protection Agency (EPA) pursuant to the federal Clean Water Act. In their petition for declaratory judgment and injunctive relief, brought under the Missouri Administrative Procedure Act, (MAPA), section 536.010, *et seq.*, the appellants alleged the Commission's inclusion of these rivers on the list was rule-making.[2] Premised on this claim of rule-making, the appellants asked the court to declare the list void and unenforceable because the Commission had not complied with statutory notice, comment and fiscal-note procedures in promulgating the list and because the Commission's decision to include the two rivers was arbitrary and capricious. The Circuit Court of Cole County dismissed the appellants' petition with prejudice, for lack of subject-matter jurisdiction. An appeal was brought in the Court of Appeals, Western District. After opinion, this Court granted transfer. *Mo. Const. article V, section 10.* The impaired waters list is not a rule and the inclusion of the rivers not rulemaking because the list has no impact on the appellants. Further, the controversy cannot be resolved by a declaratory judgment and is not yet ripe for such adjudication. The judgment of dismissal is affirmed. However, because the circuit court lacked subject-matter jurisdiction, and because the controversy is not ripe for review, such dismissal is without prejudice.

## I. Background

### A. The Clean Water Act

In response to increasing amounts of water pollution, and a growing public concern for the quality of the nation's waters, Congress passed the Clean Water Act (CWA) in 1972, enacting sweeping, comprehensive revisions to the nation's water pollution laws, which had proved to be inadequate and ineffective.[3] *See generally EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 202–3, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *Pronsolino v. Marcus,* 91 F.Supp.2d 1337, 1341(N.D.Cal.2000); *Natural Resources Defense Council v. EPA,* 915 F.2d 1314, 1316 (9th Cir.1990); Drew Caputo, A Job Half Finished: The Clean Water Act After 25 Years, 27 Envtl. L. Rep. 10574 (1997). Congress's intent in enacting the CWA was to establish "an all-encompassing program of water pollution regulation," and "to establish a comprehensive long-range policy for the elimination of water pollution." *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 318, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). The CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physi-

---

1. Appellants are the Missouri Soybean Association, Missouri Ag. Industries Council, Inc., Associated Industries of Missouri, and the Missouri Chamber of Commerce.

2. All further statutory references are to the RSMO, unless otherwise indicated.

3. The 1972 legislation was called the Federal Water Pollution Control Act Amendments of 1972, amending the Federal Water Pollution Control Act of 1948. The amendments became commonly known as the Clean Water Act, a name that Congress recognized and added to the statute during the passage of the 1977 Amendments to the Act. *See* 33 U.S.C. sec.1251; *Clean Water Act of 1977,* Pub.L. No. 95–217, 91 Stat. 1566 (1977); *Drew Caputo, A Job Half Finished: The Clean Water Act After 25 Years,* 27 Envtl. L. Rep. 10574 n. 1(1997). The Clean Water Act is codified at 33 U.S.C. sec.1251 *et seq.*

cal, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992) *quoting* 33 U.S.C. sec. 1251(a).

The CWA employs a variety of interrelated programs designed to regulate water pollution and achieve improved water quality. Two of these programs are the National Pollution Discharge Elimination System (NPDES) permit program and, the program at issue in this appeal, the Total Maximum Daily Load (TMDL) program. For purposes of this case, a detailed explanation of the intricacies of the NPDES permit program is not necessary but, because these programs are interrelated, a basic explanation is necessary. Under the CWA, no pollution may be discharged from a point source unless the point source obtains, and complies with the terms of, a NPDES permit.[4] *See, e.g., Arkansas*, 503 U.S. at 102, 112 S.Ct. 1046; *Sierra Club, North Star Chapter v. Browner*, 843 F.Supp. 1304, 1306 (D.Minn.1993). Included among the terms of a NPDES permit are effluent limitations—restrictions on the quantities, rates, and concentrations of specified substances that may be discharged from point sources.[5] *Sierra Club, North Star Chapter*, 843 F.Supp. at 1306; 33 U.S.C. sec.1362(11); *see also* 33 U.S.C. secs.1311, 1342. These limitations, which are not derived from water quality goals and measurements, apply to point sources regardless of whether a particular waterbody is polluted. *See California*, 426 U.S. at 204–5, 96 S.Ct. 2022; *Natural Resources Defense Council*, 915 F.2d at 1316; *Marcus*, 91 F.Supp.2d at 1341; Kenneth J. Warren, Total Maximum Daily Loads: A Watershed Approach to Improved Water Quality, SH041 ALI–ABA 113, 115 (2002). Under the CWA, point sources are required to use the best-available technological controls to treat their waters and limit the discharge of pollutants. 33 U.S.C. sec. 1311; *See also Natural Resources Defense Council*, 915 F.2d at 1316; *Marcus*, 91 F.Supp.2d at 1341; Warren, *supra*, at 116.

In enacting the CWA, Congress realized that the strategy of imposing effluent limitations on point sources alone might be insufficient to achieve and maintain improved water quality. *Kingman Park Civic Association v. EPA*, 84 F.Supp.2d 1, 2 (D.D.C.1999); *Natural Resources Defense Council*, 915 F.2d at 1317; Warren, *supra*, at 116. The NPDES permitting system is aimed only at controlling pollution coming from a point source. *See, e.g., Sierra Club v. Meiburg*, 296 F.3d 1021, 1024 (11th Cir.2002). However, water pollution can also come from nonpoint sources which, by their nature, cannot be regulated

---

4. Under the CWA, sources of water pollution are divided into two categories: point sources and nonpoint sources. The term "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, ... concentrated animal feeding operation, or vessel ..., from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A nonpoint source pollution has been described as pollution coming from any non-discrete source, such as runoff from farmlands, forestry, mining activity, and construction activity. *See Sierra Club v. Meiburg*, 296 F.3d 1021, 1025 (11th Cir.2002); *Sierra Club v. Hankinson*, 939 F.Supp. 865, 867 (N.D.Ga.1996).

5. As explained by the Supreme Court, a NPDES permit "serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations of the individual discharger." *California*, 426 U.S. at 205, 96 S.Ct. 2022. For further details on the NPDES, see generally 33 U.S.C. sec. 1342; *California*, 426 U.S. at 205–9, 96 S.Ct. 2022; Kenneth J. Warren, Total Maximum Daily Loads: A Watershed Approach to Improved Water Quality, SH041 ALI–ABA 113, 115 (2002).

by permits "because there is no way to trace the pollution to a particular point, measure it, and then set an acceptable level for that point." *Id.* at 1025. The CWA uses different methods and programs in order to control pollution from these other sources. *See Marcus*, 91 F.Supp.2d at 1342, 1346; Warren, *supra*, at 115–6.

Thus, in addition to imposing effluent limitations, the CWA also utilizes a water-quality based approach to achieve its goals. *Sierra Club, North Star Chapter*, 843 F.Supp. at 1307. In enacting the CWA, Congress supplemented the technology-based effluent limitations with the pre-existing regime of water quality standards. *Natural Resources Defense Council*, 915 F.2d at 1317; *Marcus*, 91 F.Supp.2d at 1341–2, 1346; 33 U.S.C. sec.1313; *See also Meiburg*, 296 F.3d at 1025. Water quality standards establish the desired condition of a waterway. *Arkansas*, 503 U.S. at 101, 112 S.Ct. 1046; 40 C.F.R. sec. 131.2. And once established, these standards also serve as the basis for establishing water-quality-based treatment controls and strategies beyond the technology-based levels of treatment. 40 C.F.R. sec.131.2(A). These standards not only serve as a means to mitigate nonpoint source pollution, but water quality standards also supplement effluent limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *Cal-ifornia*, 426 U.S. at 205 n. 12, 96 S.Ct. 2022; *Arkansas*, 503 U.S. at 101, 112 S.Ct. 1046.

States are required to establish water quality standards for each body of water within the state's borders.[6] 33 U.S.C. sec. 1313(a)-(c). To establish a water quality standard, a state first designates the beneficial uses for which a given body of water is to be protected.[7] *See, e.g., Natural Resources Defense Council*, 915 F.2d at 1317. The state then determines the "criteria"[8] for that water—the acceptable ambient level of pollutants that the body of water may contain without jeopardizing the designated use. *Id.* The ultimate objective is to achieve water quality so as to render the waterbody safe for its designated use. Warren, *supra*, at 117.

One program designed to help achieve these water quality standards is the TMDL program set forth in 33 U.S.C. sec.1313(d), known as "section 303(d)." In general, this program requires states to identify waters not meeting standards and then to establish the total maximum daily load of a pollutant for that water so that standards are met and water quality is restored.

As the first step in this program, states are required to identify and compile a list of impaired waters—those waters in that state that do not meet, or are not expected to meet, the applicable water quality standards even after effluent limitations are imposed. 33 U.S.C. sec.1313(d)(1)(A); *See*

---

6. For Missouri's water quality standards, see 10 C.S.R. sec.20–7.031. The CWA requires that these standards be reviewed at least once every three years. A state's water quality standards are subject to EPA review and approval. 33 U.S.C. sec.1313(c).

7. Examples of beneficial uses are boating, drinking water, irrigation, livestock watering, whole body contact recreation (such as swimming), wildlife habitat, protection of fish, and recreational, cultural, historical and aesthetic values. *See* 33 U.S.C. sec.1313(c)(2)(A); 40 C.F.R. sec.131.10(a); 10 C.S.R. sec.20–7.031.

8. Criteria are "expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use. When criteria are met, water quality will generally protect the designated use." 40 C.F.R. sec.131.3(b).

also, e.g., *American Canoe Association, Inc. v. EPA*, 30 F.Supp.2d 908, 912 (E.D.Va.1998). As succinctly stated, if effluent limitations and the best effluent reduction technology alone can "bring a waterway into compliance with standards, well and good. If not, then Section 303(d)(1) require[s] the waterway to join a list of unfinished business." *Marcus*, 91 F.Supp.2d at 1343. This list of impaired waters, commonly referred to as a "303(d) list," also identifies the pollutant(s) affecting the water and causing a violation of the water quality standard. 40 C.F.R. sec. 130.7; *see also American Canoe*, 30 F.Supp.2d at 912. Additionally, states must designate a priority ranking for treatment for each water on the list, taking into account the designated uses for the water and the severity of the water's impairment. 33 U.S.C. sec.1313(d)(1)(A); *See also, e.g., Sierra Club, North Star Chapter*, 843 F.Supp. at 1307; *American Canoe*, 30 F.Supp.2d at 912.[9] Once compiled, a state's 303(d) list is submitted to the EPA for review and approval or disapproval.[10],[11] 33 U.S.C. sec.1313(d)(2). Missouri's development of its 303(d) list of impaired waters for the year 1998 is the subject of this appeal.[12]

Identification of impaired waters and preparation of a 303(d) list is but the "starting point for the CWA's pollution regulation process." *American Canoe*, 30 F.Supp.2d at 912; *see also, e.g., Marcus*, 91 F.Supp.2d at 1346. Approval of a water to be included on the 303(d) list triggers a state's obligation to develop a TMDL for the listed water. 33 U.S.C. sec. 1313(d)(1)(C); *Marcus*, 91 F.Supp.2d at 1346. A TMDL represents the maximum amount of a given pollutant that can be discharged or loaded into a water without causing a violation of water quality standards. *American Canoe*, 30 F.Supp.2d at 913. By statute and regulation, the TDML calculation "must be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which

**9.** EPA regulations set out a number of requirements that a state must follow in identifying and listing its impaired waterbodies. *See* 40 C.F.R. sec.130.21.24; sec. 130.36(a). In general, these regulations set forth what data and information the state needs to consider in developing its 303(d) list, sec. 130.22; how the state should develop and document its methodology for considering and evaluating this information when making its listing decisions and developing its prioritized schedule for TMDL establishment, sec. 130.23; this methodology is subject to public review and comment, with the comments forwarded to the EPA, sec. 130.23(a), and the state's methodology is subject to EPA review, sec. 130.24. EPA regulations also require that the state provide public notice and allow the public at least a 30 days to comment on its 303(d) list prior to submitting the list to the EPA. 40 C.F.R. sec.130.36(a).

**10.** The list is also submitted to the U.S. Fish and Wildlife Service and the National Marine Fisheries Services, in order to "facilitate consideration of endangered and threatened species in the listing and TMDL process." 40 C.F.R. sec.130.36 (c)(2). States are required to consider any comments from these agencies in establishing its 303(d) list and TMDLs, and the EPA reviews any comments from these agencies prior to its approval or disapproval of a state's submitted 303(d) list. 40 C.F.R. sec.130.36 (c)(1–3).

**11.** Under the CWA, the EPA has 30 days in which to approve or disapprove a state's list of impaired waters. 33 U.S.C. sec.1313(d)(2); 40 C.F.R. sec.130.30(b)(1). If disapproved, the EPA must itself compile the 303(d) list. 33 U.S.C. sec.1313(d)(2).

**12.** From 1992 until 2000, the EPA required each state to submit an updated 303(d) list every other year (even-numbered years). *Kingman Park*, 84 F.Supp.2d at 3. In March 2000, the EPA issued a rule removing the requirement for states to file lists in 2000. Beginning in 2002, a list of impaired waterbodies must be submitted every four years. 40 C.F.R. § 130.30(a).

takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." *Id.;* 33 U.S.C. sec.1313(d)(1)(C); 40 C.F.R. sec. 130.7(c)(1).

As this language suggests, and as conceded by the appellants, TMDL development is a technically complex and time-consuming process. Scientific studies and analyses must be undertaken to calculate and determine the load of a pollutant that the waterway can assimilate without violating the water quality standard for that water. Warren, *supra,* at 118. The total maximum daily load must be established for all pollutants preventing or expected to prevent attainment of water quality standards for the particular body of water. 40 C.F.R. sec.130.7(c)(1)(ii). Once these calculations are completed, the information is incorporated into a written TMDL document.[13] TMDLs are to be developed in accordance with the prioritized schedule established by the state. *See* 33 U.S.C. sec.1313(d)(1)(D); 40 C.F.R. sec. 130.28. A number of years can elapse between the time a water is listed and the TDML for that water is scheduled for attention and completion. Under current federal regulations, TMDL development must be scheduled "as expeditiously as practicable, evenly paced over the duration of the schedule." 40 C.F.R. sec.130.28(a). For waters listed before July of 2000, TMDLs are to be completed no later than July 2010. 40 C.F.R. sec.130.28(b). States are allowed to extend the schedule for one or more TMDLs by five years if developing all the TMDLs on the list is not practica-

ble by 2010. *Id.* States may consider a number of factors in prioritizing its schedule for TMDL development, including, but not limited to, the priority ranking set forth in the 303(d) list, TMDL complexity, the value and vulnerability of particular waterbodies, the recreational, economic, and aesthetic importance of particular waterbodies, and the degree of public interest and support. 40 C.F.R. sec.130.28(e) & (f); *see also Kingman Park,* 84 F.Supp.2d at 3; 40 C.F.R. sec.130.28(c)-(d). Waters that are used as a source of drinking water, or where threatened or endangered species are present, are given a higher priority, unless the state explains why a different priority is appropriate. 40 C.F.R. sec.130.28(d)(2) & (3). As with the 303(d) list, TMDLs are also subject to EPA review and approval or disapproval, and if disapproved, the EPA must issue its own TMDL. 33 U.S.C. sec.1313(d)(2).

Establishing a waterway's assimilative capacity and TMDL is hardly the end of the road. Warren, *supra,* at 118. TMDLs are "primarily informational tools that allow the states to proceed from the identification of waters requiring additional planning to the required plans." *Pronsolino v. Nastri,* 291 F.3d 1123, 1129 (9th Cir.2002). TMDLs "serve as a link in an implementation chain that includes federally-regulated point source controls, state or local plans for point and nonpoint source pollution reduction, and assessment of the impact of such measures on water quality, all to the end of attaining water quality goals for the nation's waters." *Id.* Once established and approved, a state must incorporate the

---

**13.** Information included in this document includes the location of the impaired waterbody, the applicable water quality standards, identification of the pollutant(s), identification of the sources of the pollutant(s), the best estimates of pollution coming from nonpoint sources or natural background, the amount of pollution coming from specific point sources,

the amount of the pollutant load that can be present in the waterbody and still allow attainment of the water quality standard, a margin of safety, consideration of seasonal variances, allowances for foreseeable increases in pollutant loads, and an implementation plan. *See* 40 C.F.R. sec.130.2(h)(1–11).

TMDLs into its "continuing planning process," (CPP) which is the state's overall water-quality management plan that brings together and coordinates all aspects of the state's water pollution control program.[14] *See id.* at 1128; 33 U.S.C. sec. 1313(e).

Each TDML document includes an implementation plan. Included in this plan is a description of the control actions to be taken and a schedule for implementation of those actions. The implementation plan also provides for follow-up monitoring and evaluation and a process for making revisions based on that evaluation. States may take a variety of actions to implement the TMDL to ensure that the sum of pollutants does not exceed the TMDL and to achieve compliance with the water quality standards for that body of water. *See Meiburg,* 296 F.3d at 1025. Depending on the particular pollution problem of a given body of water, a state's plan may include more stringent controls and limitations on a point source than currently required under the NPDES permit; thus, the implementation plan could include a schedule for NPDES permit revisions. *See id.* Also a state might ultimately implement various controls regarding land-management practices, such as restricting the use of land, in order to reduce nonpoint source pollution. *See id.*

B. Missouri's Clean Water Law

In the Missouri Clean Water Law, chapter 644, our legislature announced the State's policies regarding the protection of the State's waters. *See* sec. 644.011. In part, the act declares that the policy of this State is: to conserve the waters of the State; to protect, maintain, and improve the quality of the State's waters; to ensure that no waste is discharged into any waters of the State without first receiving treatment to protect the beneficial uses of the waters and to meet the requirements of the CWA; and to provide for the prevention, abatement and control of new or existing water pollution. Sec. 644.011. The Missouri Clean Water Law was enacted, in part, precisely to provide the authority required of the State under the CWA and to bring the State's water pollution regulatory programs into compliance with the CWA. *See* sec. 644.011; Peter N. Davis, Federal and State Water Quality Regulation and Law in Missouri, 55 MOLR 411, 415–6 (1990).

In Missouri, the State's responsibilities under the CWA are carried out by two administrative agencies: the Missouri Department of Natural Resources (MDNR) and the Commission. The MDNR is Missouri's "general environmental agency charged with administering the 'programs assigned to the Department relating to environmental control and the conservation and management of natural resources.'" *Willamette Industries, Inc. v. Clean Water Commission of the State of Missouri,* 34 S.W.3d 197, 199 (Mo.App. 2000) *quoting* sec. 640.010.1. The Commission is Missouri's water contaminant control agency and is structurally assigned to the MDNR. Secs. 640.010.3 and 644.021.1; *see also Craven v. State ex rel. Premium Standard Farms, Inc.,* 19 S.W.3d 160, 164 (Mo.App.2000)(discussing the Omnibus State Reorganization Act of 1974).[15] The

---

14. A state's CPP is also subject to EPA approval and periodic review to ensure compliance with the CWA. 33 U.S.C. sec.1313(e)(2) & (3).

15. The Commission is statutorily charged with a number of duties, and granted numerous powers, including: (1) the "general supervision of the administration and enforcement" of the Missouri Clean Water Law, sec. 644.026.1(1); (2) developing "comprehensive plans and programs for the prevention, control and abatement of new or existing pollu-

Commission is responsible for submitting the State's 303(d) list to the EPA.

## C.  Missouri's 303(d) List for 1998

MDNR presented its recommended list of impaired waters at the Commission's public meeting in September 1998. The list did not include the Rivers. During this meeting, representatives of various organizations spoke for and against inclusion of the Rivers on the list. A representative from MDNR affirmed that the Rivers were not being recommended for inclusion on the list. The Commission adopted the 303(d) list as recommended by the MDNR, but also added the Rivers to the list. This marked the first time the Rivers had been included on Missouri's 303(d) list.

As required by the Clean Water Act, the Commission submitted Missouri's list of impaired waters to the EPA. The list submitted by the Commission divided the waters into three categories: (1) those waters proposed for full TMDL development; (2) those waters reported as impaired, but for which documentation was outdated or inadequate—requiring further environmental monitoring prior to TMDL development. If the additional monitoring confirmed the impaired status, then full TMDL development would proceed; and (3) those waters, recognized as impaired, but for which there was no practical reme-

dy.[16] The Rivers were listed in the second category of waterbodies—those waters requiring further environmental monitoring and collection of data to assess the waters' impairment before TMDLs could be developed. The Rivers were listed as impaired because of "habitat loss," due to "channelization," and given a medium priority ranking. No specific dates were scheduled for the development of TMDLs for the Rivers; rather, the schedule dates were left as "to be determined."

After review, the EPA partially approved Missouri's submitted list and partially disapproved the list for failure to include five waters that did not meet Missouri's water quality standards and for failure to retain ten waters from the State's 1996 list. The EPA approved Missouri's identification of waters included on the submitted 303(d) list, including the Rivers, and, following publication and a period of public comment on its proposed addition of fifteen waterbodies, the EPA added six waters to Missouri's 303(d) list for 1998. The final list contained a total of 165 waters. As to Missouri's three-category division of the listed waters, the EPA stated that even though Missouri chose to categorize its list, the EPA's position remained that TMDLs were to be established for all waterbodies on Missouri's 1998 list.[17]

tion of the waters of the state," sec. 644.026.1(2);  (3) identifying waters of the state and prescribing water quality standards for them, sec.644.026.1(7);  (4) the power to promulgate rules and regulations to enforce and implement Missouri's Clean Water Law, and the duties imposed on the state by the CWA, sec.644.026.1(8);  and (5) the power to exercise all incidental powers necessary to carry out the purposes of Missouri's Clean Water Law, and to assure that the State of Missouri complies with the CWA, sec. 644.026.1(16).

16.  Additional actions for the waters in this third category would consist of either use attainability analysis to examine naturally occurring contaminants (such as manganese concentrations) or development of TMDLs to address conditions that are very difficult to remedy (such as sediment contaminated with chlordane).

17.  Following the EPA's final determination, appellant Missouri Soybean Association brought an action in federal court unsuccessfully challenging the EPA's approval of Missouri's 1998 list. *Missouri Soybean Association v. EPA*, 289 F.3d 509 (8th Cir.2002).

## D. Procedural History

After the Commission's adoption of Missouri's 303(d) list, the appellants, pursuant to section 536.050.1 and the equitable powers of the court, filed a petition for declaratory judgment and injunctive relief, challenging the promulgation of the list. The appellants alleged the 303(d) list was a rule, as defined in MAPA, section 536.010(4), and that the Commission's decision designating waters to be included in the list was rulemaking. They further claimed that they would be injured because, "as a result of the section 303(d) list and the resulting TMDL requirements," there would be changes in land-management practices, limits on the sales and use of fertilizers and pesticides, limits on crop growth and rotation, decreased crop yields, increased farming costs, limitations on production and/or manufacturing quantity and quality, changes in NPDES point source effluent limitations, increased cost of water treatment, restrictions on locations for production and manufacturing, and limitations on raw materials that could be used in production or manufacturing. Premised on their claim that the 303(d) list was a rule, the appellants sought to have the list declared void and unenforceable because the Commission and MDNR had failed to comply with the appropriate rulemaking procedures and because the Commission's decision to include the Rivers was arbitrary and capricious.[18]

The circuit court dismissed the appellants' action with prejudice, for lack of subject-matter jurisdiction. The court found that neither the Commission nor MDNR had rendered a final decision subject to judicial review. Rather, the court found that the EPA was the final arbiter of whether a particular waterbody is impaired, and that while the EPA may have rendered a final decision with respect to the 1998 list of impaired waters, that agency's actions were beyond the purview of the court.

## II. Standard of Review

▇▇▇ A court's authority to adjudicate a controversy is based on three essential elements; the court must have jurisdiction of the subject matter, jurisdiction of the res or the parties, and jurisdiction to render the particular judgment in the particular case. *State ex rel. Lambert v. Flynn*, 348 Mo. 525, 154 S.W.2d 52, 57 (banc 1941). Subject-matter jurisdiction concerns "the nature of the cause of action or the relief sought" and exists only when the court "has the right to proceed to determine the controversy or question in issue between the parties, or grant the relief prayed." *State Tax Com'n v. Administrative Hearing Com'n*, 641 S.W.2d 69, 72 (Mo. banc 1982) *quoting Cantrell v. City of Caruth-*

18. The appellants allege respondents failed to comply with MAPA's rulemaking procedures. Specifically, the appellants first alleged that the respondents had adopted a rule without the proper notice as required under section 536.02 and had failed to submit the proposed list as a rule to the joint committee on administrative rules as required by section 536.024. The appellants also alleged noncompliance with MAPA because no fiscal note was filed with either the proposed or the final 303(d) list, in violation of sections 536.200 and 536.205. The appellants also alleged the respondents' actions in approving the list and including the Rivers on the list were arbitrary and capricious because the respondents lacked evidence that effluent limits were insufficient to meet water quality standards, and because the respondents lacked evidence of any water quality contaminant violations for the Rivers to support the inclusion of the Rivers on the list. Finally, the appellants alleged that the respondents' failure to provide adequate notice of the September meeting violated Missouri's Sunshine Law. The appellants' claim regarding a violation of Missouri's Sunshine Law is not raised on appeal.

*ersville,* 359 Mo. 282, 221 S.W.2d 471, 476 (1949). In other words, subject-matter jurisdiction is "the power to hear and determine cases of the general class to which the proceedings in question belong...." 21 C.J.S. Courts sec.18, p. 24 (1990); *Boone v. Lou Budke's Arrow Finance Co., Inc.,* 98 S.W.3d 555 (Mo.App.2002). "A court obtains jurisdiction of the subject matter by operation of law...." *United Cemeteries Co. v. Strother,* 342 Mo. 1155, 119 S.W.2d 762, 765 (1938); *Lambert,* 154 S.W.2d at 57. And, although a court may be a court of general jurisdiction, when it engages in the exercise of a special statutory power, the court is confined strictly to the authority given by the statute. *See King v. Kinder,* 690 S.W.2d 408, 409 (Mo. banc 1985); *Randles v. Schaffner,* 485 S.W.2d 1, 3 (Mo. 1972); *State ex rel. Kansas City v. Public Service Com'n,* 362 Mo. 786, 244 S.W.2d 110, 115 (1951). In this case, the appellants brought their action pursuant to section 536.050.1, which authorizes the courts of this State to render declaratory judgments as to the validity of a rule or the threatened application of such a rule. Thus, the court's subject-matter jurisdiction was limited by the provisions of that section. *See Cook v. Cook,* 97 S.W.3d 482 (Mo.App.2002); *King,* 690 S.W.2d at 409.

Dismissal for lack of subject-matter jurisdiction is proper whenever it appears, by suggestion of the parties or otherwise, that the court is without jurisdiction. Rule 55.27(g)(3); *Lederer v. Director of Division of Aging,* 865 S.W.2d 682, 684 (Mo.App.1993); *Beth Hamedrosh Hagodol Cemetery Ass'n v. Levy,* 923 S.W.2d 439, 442 (Mo.App.1996); *James v. Poppa,* 85 S.W.3d 8, 9 (Mo. banc 2002). The quantum of proof is not high; it must appear by the preponderance of the evidence that the court is without jurisdiction. *James,* 85 S.W.3d at 9. Generally, the decision to dismiss for lack for subject-matter

jurisdiction is a question of fact left to the sound discretion of the trial court, and it will not be reversed on appeal absent an abuse of that discretion. *Golden Rule Insurance Company v. Missouri Department of Insurance,* 56 S.W.3d 471, 474 (Mo.App.2001); *James,* 85 S.W.3d at 9. However, where, as here, the facts are uncontested, a question as to the subject-matter jurisdiction of a court is purely a question of law, which is reviewed *de novo.* *B.C. National Banks v. Potts,* 30 S.W.3d 220, 221 (Mo.App.2000). This Court is primarily concerned with the correctness of the result, not the route taken by the trial court to reach it; the trial court's judgment will be affirmed if it is correct on any ground supported by the record, regardless of whether the trial court relied on that ground. *Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus,* 824 S.W.2d 92, 94 (Mo.App.1992); *Lough by Lough v. Rolla Women's Clinic, Inc.,* 866 S.W.2d 851, 852 (Mo. banc 1993); *Felling v. Giles,* 47 S.W.3d 390, 393 (Mo.App.2001).

### III. Analysis

MAPA provides that the power of the courts of this State to render declaratory judgments shall extend to declaratory judgments challenging the validity of a rule or the threatened application of such a rule. Section 536.050.1. A declaratory judgment under MAPA, therefore, is not available unless the administrative action in question constitutes a rule.

MAPA defines a "rule," as at issue in this case, as

... each agency statement of general applicability that implements, interprets, or prescribes law or policy, ... [subject to certain exceptions] ....

Section 536.010(4). Seeking to clarify this concept of a "rule" as set out in the administrative procedure acts, commentators have proposed various explanations and

definitions of "rules" and "rulemaking." [19] Considering these, it is evident that the state's 303(d) list is not a rule. Rulemaking "involves the formulation of a policy or interpretation which the agency will apply in the future to all persons engaged in the regulated activity." Arthur Earl Bonfield, State Administrative Rule Making, sec. 3.3.1 at 76 (1986) *quoting* E. Gellhorn, Administrative Law and Process in a Nutshell 121–122 (1972); *see also* 73 C.J.S. Public Administrative Law and Procedure sec. 87 (1983). Stated differently, rulemaking "affects the rights of individuals in the abstract and must be applied in a further proceeding before the legal position of any particular individual will be definitively touched by it." Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise sec. 6.1 at 228 (3d. ed.1994); Bonfield, *supra* sec. 3.1, at 60, *quoting* J. Dickinson, Administrative Justice and the Supremacy of Law 2 (1927). In distinguishing between rules and general statements of policy, it has been said that an agency statement is a rule " . . . if it purports in and of itself to create certain rights and adversely affects or serves by its own effect to create rights or to require compliance, or otherwise to have the direct and consistent effect of law." 73 C.J.S. *supra* sec. 87, p. 578. Stated more simply, as explained by one federal court, "a properly adopted substantive rule establishes a standard of conduct which has the force of law." *Pacific Gas & Electric Company v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir.1974).

Here, the State has merely conducted an inventory of the waters in the state and compiled a list of those waters that fail to meet applicable water quality standards. A list of Missouri's impaired waters does not establish any "standard of conduct" that has the "force of law." The list does not command the appellants to do anything or to refrain from doing anything; no legal rights or obligations are created. By its definition, a rule must be of "general applicability." Section 536.010(4). Implicit in this concept is that something— the purported "rule"—will be *applied* to some as yet unnamed, unspecified group of people.

Such is not the case here. The list will not be used or applied to the appellants in any future proceeding to determine whether or not they have violated a norm embodied in said list. Rather, the list identifies the waters in the state that are impaired and is submitted to the federal government for review and approval or disapproval. The mere nomination of these waters has no effect on the appellants' rights.

Consistent with these scholarly definitions, this Court, in *Baugus,* clarified MAPA's definition of a rule, noting:

> Not every generally applicable statement or "announcement" of intent by a state agency is a rule. Implicit in the concept of the word "rule" is that the agency declaration has a potential, however slight, of impacting the substantive or procedural rights of some member of the public.

*Baugus v. Director of Revenue,* 878 S.W.2d 39, 42 (Mo. banc 1994) *citing* Bonfield, *supra* sec. 3.3.1.[20]

---

**19.** The definition of a "rule," as set out in MAPA, is based on the 1961 version of the Model State Administrative Procedure Act, sec. 1(7). *See* Arthur Earl Bonfield, State Administrative Rule Making, sec. 3.3.1 (1986).

**20.** In that case, this Court found that the Director of Revenue's announced intention of placing the word "prior" before the word "salvage" on motor vehicle titles was not a MAPA rule subject to rulemaking procedures. In so finding, this Court noted that the word merely communicated the difference between

Here, the appellants argue that the 303(d) list constitutes a rule and the respondents have engaged in rulemaking. They argue this "potential impact" criterion set out in *Baugus* is met in this case. The appellants alleged multifarious harms, including changes in land-management practices, limits on crop growth and rotation, increased farming costs, restrictions on locations for production and manufacturing, and changes in NPDES point-source effluent limitations. The Commission, however, has merely nominated waters for inclusion on a federal list of impaired waters that merit further study. The appellants' claims exclusively rest on hypothesized harms resulting from potential future regulations. The appellants make no claim of harm, nor indeed could they, from the mere nomination of the Rivers for further study. Indeed, even by their petition, the appellants alleged they would be harmed "as a result of the section 303(d) list *and the resulting TMDL requirements*" (emphasis added). Clearly, the appellants' claims are premised on a mischaracterization and vast oversimplification of the long, complex, interdependent, and contingent system of mechanisms created by the CWA to control and abate water pollution. There is no simple clockwork progression from the Commission's impaired waters list to land-use regulation. Stricter regulatory controls will not occur, if at all, until after the EPA approves the State's nominated list, TMDL development is scheduled, studies are performed, the total maximum daily load of pollutants are calculated, an implementation plan is drawn up with a description of the control actions to be taken and a schedule for their implementation, the TMDL is approved by the EPA, incorporated into the State's CPP, and the implementation plan is put into effect through further permit restrictions or other regulations. TMDLs are developed and implemented through future regulations. The appellants have prophesied that these future regulations would adversely impact them, but such presumptuous pleading is pure speculation that must be rejected. No study has occurred and no regulation has been proposed.

■ Under *Baugus*, an agency declaration cannot constitute a rule unless it has a potential impact on the rights of some member of the public. Here, the appellants can point to no potential impact of the Rivers' nomination. Rather than identifying the *potential impact of a rule*, as *Baugus* requires, the appellants prophesy *the impact of a potential rule*. But there is a world of difference between an agency declaration that, in and of itself, has the potential, even slightly, to impact one's rights and an agency declaration that could only impact one's rights if further regulations would someday occur. Again, *Baugus* defines a rule as an agency declaration with the potential to impact rights; yet, the appellants point to an agency declaration that could only impact their rights if certain later regulations would occur.

Of course, if the State did, after due study, propose regulations impacting the appellants, they would enjoy the full panoply of rights guaranteed by our statutes to those that choose to contest such regulations. But the appellants are discontented with this later "bite at the apple." They instead hope to derail governmental consideration of whether an apple tree should even be planted. This the law does not allow.

two types of titles, and it did not substantially affect the legal rights of any party. *Baugus*,

878 S.W.2d at 42.

Because Missouri's 303(d) list for 1998 is not a rule, the circuit court lacked subject-matter jurisdiction pursuant to section 536.050.1 to render the sought-after declaratory judgment.[21,22,23]

■■■■ An examination of the general principles underlying declaratory judgments also supports dismissal of the appellants' action. A declaratory judgment is not a general panacea for all real and imaginary legal ills. *Harris v. State Bank & Trust Company of Wellston*, 484 S.W.2d 177, 178 (Mo.1972); *City of Joplin v. Jasper County*, 349 Mo. 441, 161 S.W.2d 411, 413 (1942). It is not available to adjudicate hypothetical or speculative situations that may never come to pass. *Farm Bureau Town and Country Insurance Company of Missouri*, 909 S.W.2d 348, 352 (Mo. banc 1995); *State ex rel Nixon v. American Tobacco Company, Inc.*, 34 S.W.3d 122, 128 (Mo. banc 2000); *see also Local Union 1287 v. Kansas City Area Transportation Authority*, 848 S.W.2d 462, 464 (Mo. banc 1993)(noting reasons courts decline to render hypothetical judgments and opinion). To grant a declaratory judgment, the court must be presented with:

(1) a justiciable controversy that presents a real, substantial, presently-existing controversy admitting of specific relief, as distinguished from an advisory decree upon a purely hypothetical situation; (2) a plaintiff with a legally protectable interest at stake, "consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief;" (3) a controversy ripe for judicial determination; and (4) an inadequate remedy at law. *Northgate Apartments, L.P. v. City of North Kansas City*, 45 S.W.3d 475, 479 (Mo.App.2001); *see also Missouri Health Care Association v. Attorney General of the State of Missouri*, 953 S.W.2d 617, 620 (Mo. banc 1997).

■■■■ A declaratory judgment should have a "conclusive effect and should lay to rest the parties' controversy." *Jones v. Carnahan*, 965 S.W.2d 209, 214 (Mo.App. 1998); *Peters v. Board of Education of Reorganized School District No. 5 of St. Charles County*, 506 S.W.2d 429, 431 (Mo. 1974). A declaratory judgment must "declare a fixed right and accomplish a useful purpose." *Local Union 1287*, 848 S.W.2d

---

**21.** The appellants also contend that the 303(d) list is a rule by virtue of the language of sec. 644.026.1(8), which the appellants read as mandating that the Commission act *only* by formal rulemaking in discharging its duties under the federal CWA. The argument is without merit. The appellants cite no authority for this proposition. Further, the plain language of this section empowers the Commission to act by rulemaking, but does not require that it act only by rulemaking. The appellants further contend that even if the 303(d) list is not a rule, adoption of the list was a "determination," subject to judicial review under section 644.071. This Court need not reach this issue. The appellants' allegation was not raised in the circuit court, but rather, was raised for the first time on appeal; thus the issue is not preserved for review. *See Artman v. State Board of Registration for the Healing Arts*, 918 S.W.2d 247, 252 (Mo. banc 1996).

**22.** Since the 303(d) list is not a rule under MAPA, whether the 'intergovernmental communications' exception to the definition of a rule, section 536.010(4)(c), applies in the present case need not be addressed.

**23.** Appellants' claim that the later enactment of section 644.036.5, enacted after opinion by the court of appeals, and providing that a 303(d) list be adopted by rule, has no relevance to this appeal. The appellants concede that courts should normally assume the legislature intended to accomplish some purpose by amending a statute. The appellants claim that the amendment here was to "clarify" existing law, rather than to change existing law. But the appellants advance no reason in law or logic why this Court should not indulge the normal assumption that the legislature intended to change the law.

at 463. Yet, what useful purpose could a declaratory judgment serve here since the EPA has already accepted and modified Missouri's 303(d) list and the federal courts have already rejected a challenge to the EPA's listing?[24] At oral argument, the appellants could not even predict the effect such a declaratory judgment would have. Clearly, a declaratory judgment here would not have a "conclusive effect" or "lay to rest the parties' controversy" if the appellants cannot even predict such judgment's effect.

Moreover, the authority of the courts of this State to render declaratory judgments must be used and operate within the limits of the constitutional powers and duties of the courts. *City of Joplin,* 161 S.W.2d at 412. One such limit is the traditional doctrine of ripeness, which, when applied in this case, also commands dismissal of the appellants' action. A court cannot render a declaratory judgment unless the petition presents a controversy ripe for judicial determination. *See Missouri Health Care,* 953 S.W.2d at 620. In the context of administrative agency action, the ripeness doctrine allows a court to "apply a pragmatic test to determine whether the agency action is sufficiently binding and sufficiently clear in scope and implications to be susceptible to judicial evaluation in the form in which it is presented." Davis & Pierce, *supra* sec. 15.1, at 306. The basic rationale of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judi-cial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 148–9, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)(overruled on other grounds).

*Abbott* is the seminal case in the modern era of ripeness law.[25] *See* Davis & Pierce, *supra* sec. 15.12. The teachings of *Abbott* have become deeply entrenched, with courts applying the two-fold inquiry set forth in that case to determine ripeness in a variety of contexts. *Id.* The test set forth in *Abbott* "has proven to be equally effective in determining the ripeness of challenges to the validity of state and federal statutes, agency rules, and a wide variety of less formal agency pronouncements." *Id.* In Missouri, the ripeness doctrine is much the same as stated in *Abbott. State ex rel. Kan. Power & Light v. PSC,* 770 S.W.2d 740, 742 (Mo.App.1989). The teachings of *Abbott* guide this Court's decision today, much as they have previously. *See Missouri Health Care Association v. Attorney General of the State of Missouri,* 953 S.W.2d 617 (Mo. banc 1997); *see also, e.g., Buechner v. Bond,* 650 S.W.2d 611, 614 (Mo. banc 1983)("In order that a controversy be ripe for adjudication a 'sufficient immediacy' must be established. Ripeness does not exist when the question rests solely on a probability that an event will occur."); *Ports Petroleum Co., Inc. of Ohio v. Nixon,* 37 S.W.3d 237, 241 (Mo. banc 2001)("A 'ripe controversy' is one of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

**24.** See *Missouri Soybean Association v. EPA,* 289 F.3d 509 (8th Cir.2002).

**25.** *Abbott* was one of a trilogy of decisions focusing solely on ripeness, which were handed down on the same day. See also *Toilet Goods Assn. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Assn.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). This trilogy of cases marked a major turnaround in the law of ripeness. *See* Davis & Pierce, *supra* sec.15.12.

■ Determining whether a particular case is ripe for judicial resolution requires a two-fold inquiry: a court must evaluate (1) whether the issues tendered are appropriate for judicial resolution, and (2) the hardship to the parties if judicial relief is denied. *Abbott Laboratories*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In *Abbott*, the Court found ripe for judicial review a pre-enforcement challenge to an FDA regulation requiring that labels and advertisements for prescription drugs include the corresponding generic name of a drug every time the proprietary (trade) name was used. The Court found the issues presented were appropriate for judicial resolution, as the regulations were a "final agency action," [26] the issue of statutory construction presented was a purely legal one, and no further administrative proceedings were contemplated. *Id.* at 149, 87 S.Ct. 1507. The Court also found the impact of the regulations was "sufficiently direct and immediate" to render the issue appropriate for judicial review. *Id.* at 152, 87 S.Ct. 1507. The regulations, which were effective immediately, would have a direct and significant effect on the day-to-day business of all prescription drug companies and forced the companies to choose between compliance at considerable cost and noncompliance at the risk of criminal and civil penalties. The Court's rationale is summarized as follows:

> Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstances, neither of which appears here.

387 U.S. at 152, 87 S.Ct. 1507.[27]

The Supreme Court applied the teachings of *Abbott* in *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), and found that the dispute was not ripe for court review. In that case, the Sierra Club challenged the lawfulness of a federal management plan for the Wayne National Forest, which had been developed by the United States Forest Service, pursuant to the National Forest Management Act of 1976. The Sierra Club claimed that the plan permitted too much logging and too much clearcutting. Although the plan made logging in the forest more likely, before the Forest Service could permit logging, it had to: (a) propose a particular site and specific harvesting method, (b) ensure that the project was consistent with the overall plan, (c) provide affected parties with notice and an opportunity to be heard, (d) conduct an environmental analysis of the project, and (e) make a final decision to permit logging, which decision affected persons could challenge through administrative avenues and in court.

---

**26.** The Court found the regulations to be a "final agency action" "within the meaning of section 10 of the Administrative Procedure Act, 5 U.S.C. sec.704, as construed in judicial decisions." *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. 1507.

**27.** *Compare Toilet Goods Assn. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (holding pre-enforcement review of regulation not ripe for adjudication; the legal issue could arise in a variety of contexts; thus review would be better served in context of specific application of the regulation than in the context of a general challenge; and, hardship to challengers was minimal if judicial review was withheld, the regulation did not affect the primary conduct of the challengers' business, and at most they would only suffer suspensions of certification for noncompliance).

In applying the *Abbott* test, the Court considered (1) if delaying review would "cause hardship to the plaintiffs," (2) "whether judicial intervention would inappropriately interfere with further administrative action," and (3) "whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry*, 523 U.S. at 733, 118 S.Ct. 1665. When taken together, these considerations foreclosed judicial review.

The Court first found that withholding court review at the present time would not cause the parties significant hardship. The provisions of the plan did not "create adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm." *Id.* at 733, 118 S.Ct.1665. As explained by the Court, the plan's provisions "do not command anyone to do anything or to refrain from doing anything; ... they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Id.* at 733, 118 S.Ct. 1665. The Court also found that the plan did not presently inflict significant practical harm upon the interest of the Sierra Club. The Sierra Club had not shown any way in which the plan could presently force the Sierra Club to modify its behavior to avoid future adverse consequences. *Id.* at 734, 118 S.Ct. 1665. And, given the numerous steps and procedural requirements the Forest Service had to observe before it permitted logging, the Court found that the Sierra Club did not need to bring its challenge at the present time, but would have ample opportunity to bring its challenge at a later time when harm was "more imminent and more certain." *Id.* at 734, 118 S.Ct. 1665.

In addition to finding that immediate review could hinder the agency's efforts to refine its policies, the Court also found courts would benefit from further factual development. The Court reasoned that immediate review of the Sierra Club's claims would:

> require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time. That review would have to take place without benefit of the focus that particular logging proposals could provide.... [D]epending upon the agency's future action to revise the Plan or modify the expected methods of implementation, review now may turn out to have been unnecessary.

*Id.* at 736, 118 S.Ct. 1665.

In accord with these teachings of the Supreme Court, the federal courts have already rejected appellant Missouri Soybean Association's (MSA) challenge to the EPA's approval of Missouri's 303(d) list for 1998. *Missouri Soybean Association v. EPA*, 289 F.3d 509 (8th Cir.2002). MSA claimed the EPA should have disapproved Missouri's list because some of the listed waters, including the Rivers, lacked documentation of pollutants in order to be listed as impaired. The harms MSA alleged that would result from the premature listing are identical to many of the claims that the appellants alleged in the present action. *See id.* at 511.

Because MSA had not shown that the EPA's approval affected MSA's members in any concrete way, the Eighth Circuit held that the suit was not ripe for adjudication and should be dismissed. The court reasoned that:

> MSA's complaint focuses on potential harm to its members resulting from stricter controls of the use of the challenged waters. More stringent controls on water use, however, will not occur until after TMDLs are developed and implemented. Even then, it remains un-

certain whether TMDL development or regulatory implementation will adversely impact MSA's members. *Id.* at 512. Concluding, the court found that "until objectionable TMDLs are developed and implemented, MSA's claims of harm are too remote to be anything other than speculative and are not ripe for judicial resolution." *Id.* at 513.

■ Clearly, if the challenge to the federal government's approval of the list of impaired waters is not ripe for adjudication, so too must the challenge to the State's earlier nomination of the waters be unripe. Neither the law nor our rivers would be clarified by inconsistent holdings. In the present case, the Commission merely listed waters that failed to meet applicable water quality standards. This list was then submitted to the EPA for review and approval or disapproval. Even if the federal government's approval of the waters, including the Rivers, on the 303(d) list is viewed as the inevitable consequence of the Commission's nomination, this merely triggers a duty by the State to study comprehensively the waters' pollutants and then to ultimately propose limits of such pollutants. The State's impaired waters list requires no change in the appellants' conduct. It does not command them to do anything, nor to refrain from doing anything. As explained earlier, no rights or obligations have been created. And, with nothing to comply with, there are no possible penalties for noncompliance. There are many steps remaining before the appellants may be required to alter their conduct. As explained earlier, controls to decrease water pollution will not come into play, if at all, until after TMDLs are developed and implemented. At this point in time, there is no way of knowing what these controls will be. The controls could affect different parties in a variety of different ways—if at all. Review now, based on generalities and speculation, would require a crystal ball or, at least, a lively imagination. Review should occur only when claims of harm are "more imminent and more certain" and the effects of the regulatory process to control water pollution are felt in a concrete way.

■ In conclusion, because the State's 303(d) list for 1998 is not a rule and the inclusion of the Rivers not rulemaking, and because the controversy cannot be resolved by declaratory judgment and is not ripe for adjudication, the judgment of dismissal is affirmed. However, because the circuit court lacked subject-matter jurisdiction, and because the controversy is not ripe for review, the judgment of dismissal is modified to one without prejudice. Rule 84.14; *see also Parmer v. Bean,* 636 S.W.2d 691, 694 (Mo.App.1982); *Brinson v. Whittico,* 793 S.W.2d 632, 633 (Mo.App. 1990). The appellants are free to again seek the court's intervention if any regulation is proposed. But because this challenge to yet-to-be-proposed regulations is premature, appellants are urged to sheath their swords until, after a lengthy study, regulations impacting them are proposed. Then, and only then, should appellants seek to slay the regulatory dragon that they have presently conjured out of thin air.

The judgment, as modified, is affirmed.

WHITE, WOLFF, LAURA DENVIR STITH and TEITELMAN, JJ., concur.

LIMBAUGH, C.J., dissents in separate opinion filed; BENTON, J., concurs in opinion of LIMBAUGH, C.J.

PRICE, J., not participating.

STEPHEN N. LIMBAUGH, JR., Chief Justice, dissenting.

I respectfully dissent. I would hold that the 1998–303(d) list is a rule under the

MAPA and that promulgation of the 1998–303(d) list violated the MAPA's rulemaking procedures and is therefore void.

## I.

Section 536.010(4) of the MAPA defines a "rule" as "each statement *of general applicability* that *implements . . . or prescribes law or policy*, or that describes the organization, procedure, or practice requirements of any agency." (Emphasis added.) In my view, the 1998–303(d) list promulgated by the Clean Water Commission meets this statutory definition. First, the list is an agency action of "general applicability." As this Court has held, the notion of "general applicability" is satisfied where the agency statement of policy or interpretation of law "acts on unnamed and unspecified [persons and] facts . . . ." *NME Hospitals, Inc. v. Dept. of Social Services*, 850 S.W.2d 71, 74 (Mo. banc 1993). Here, the agency action has the potential to affect millions of Missourians who live near or who use the listed waters in some capacity. In fact, the 303(d) list submitted by the Commission identified 165 bodies of water throughout the State that were deemed to be "impaired" by at least one pollutant, and the list included the Missouri and Mississippi Rivers, by far the largest and most commercially traveled waterways in the State. After a quick approval by the EPA, these listed waters are now subject to TMDL development, which will inevitably lead to increased restrictions on those individuals who live near or use the listed waters. Under these circumstances the "general applicability" requirement is satisfied.

Second, a review of the substantive and procedural aspects of the Missouri Clean Water Law demonstrates that respondents promulgated the 1998–303(d) list with the intent of "prescribing" and "implementing" governmental policy. As noted by the majority, the Missouri Clean Water Law, sec. 644.006, *et seq.*, originally enacted in 1972, declares Missouri's public policy for the protection of the State's waters, as follows:

> [W]hereas this state must possess the authority required of states in the [federal Clean Water Act] if it is to retain control of its water pollution control programs, it is hereby declared to be the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof . . . to provide for the prevention, abatement and control of new and existing water pollution; and to cooperate with other agencies of the state . . . the federal government and any other persons in carrying out these objectives.

Sec. 644.011, RSMo.

All agree that the 303(d) list was developed in response to the requirements imposed upon the states under the federal Clean Water Act, 33 U.S.C. sec. 1313(d)(1)(A). The objective of the federal Act, which is the same as that expressed by Missouri in its Clean Water Law, sec. 644.011, RSMo, is to protect, maintain, and improve the quality of the state's waters through cooperative action. Compilation of the 303(d) list is the first and most significant step in accomplishing this policy, for it is not until the impaired waterbodies are identified that federal and state regulators may begin the difficult tasks of targeting the harmful pollutants and regulating the responsible polluters. Accordingly, when the state compiles a 303(d) list, it does so with the aim of "prescribing" and "implementing" both federal and state environmental policy. *See Tonnar v. Missouri State Highway and Transp. Comm'n*, 640 S.W.2d 527 (Mo.App.1982) (holding respondent agency engaged in rulemaking when it created a "Right–of–

Way" manual pursuant to federal directives).

That the promulgation of the 1998–303(d) list "prescribes" and "implements" the "general[ly] applicabl[e]" policy of this State with regard to the quality of Missouri's waters in satisfaction of the section 536.010(4) test does not, however, end the inquiry. In *Baugus v. Director of Revenue*, 878 S.W.2d 39 (Mo. banc 1994), this Court expanded on the MAPA's general definition of "rule," stating:

> Implicit in the concept of the word "rule" is that the agency declaration has a *potential, however slight*, of impacting the substantive or procedural rights of some member of the public. Rulemaking, by its nature, involves an agency statement that affects the rights of individuals in the abstract.

*Id.* at 42 (citing BONFIELD, STATE ADMINISTRATIVE RULE MAKING, sec. 3.3.1). (Emphasis added.) In addressing the *Baugus* requirement, appellants maintain that inclusion of the Missouri and Mississippi Rivers on the list may potentially affect their economic interests because of the likelihood of additional restrictions on their farmlands abutting the Rivers. Specifically, the appellant associations and their members argue that as a result of the 1998–303(d) list, the State must develop and implement TMDLs for the Rivers that will necessitate: changes in land management practices; limitation on sales and use of fertilizers, pesticides, and herbicides; increased costs in satisfying new pollution standards; increased costs of water treatment; and limitations on raw materials that can be used in production or manufacturing. Although respondents discount these claims of potential harms as "hyperbole" and the majority characterizes them as "speculative," it cannot be denied that if the Rivers are included on the approved 303(d) list, TMDLs must be developed, and that in order to comply with the TMDLs, land use regulation must follow—all as required under the

Clean Water Act. Thus, the potential for impacting the rights of association members is more than sufficient to meet the *Baugus* requirement and further confirms that promulgation of the 303(d) list is the promulgation of a rule.

As I see it, the disconnect between my position and that of the majority is my willingness and the majority's unwillingness to acknowledge that the federal-state regulatory scheme contemplates a series of discrete rulemaking efforts, not a single process that eventually will culminate in final or ultimate land use regulations. Of course, the 303(d) list is not a final or ultimate land use regulation; it is instead a threshold determination—a precursor rule on which subsequent rules and regulations may be based. But it is no less a rule. Though the majority holds there is no "final agency action," there is indeed a "final agency action" as to the 303(d) list. Moreover, it is an action that has a real and immediate harm to the appellants in this case—an action that itself constitutes a "potential impact" on the substantive rights of appellants by subjecting them to further rulemaking efforts in the establishment of TMDLs and the eventuality of land use regulations.

Alternatively, the majority holds that this case is not yet ripe for review. Initially, it must be noted that the issue of ripeness was not raised, briefed or argued by either party. Appellants, therefore, have not had the opportunity to respond to the majority's novel reasoning on this issue. In any event, the majority cites no Missouri cases addressing ripeness in the context of a challenge to the validity of a rule under section 536.050.1 of the MAPA. Instead, the majority relies on federal jurisprudence, and *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in particular, in holding, in essence, that appellants are not

sufficiently aggrieved to bring a declaratory judgment action. On this issue, however, Missouri law is more lenient than federal law. Section 536.053, RSMo 2000, provides that

> Any person who is or *may* be aggrieved by any rule promulgated by a state agency shall have standing to challenge any rule promulgated by a state agency and may bring such an action pursuant to the provisions of section 536.050.

(Emphasis added.) Although this provision is couched in terms of standing, rather than ripeness, in Missouri, the doctrine of standing encompasses the requirement of ripeness. *See Missouri Health Care Ass'n v. Attorney General of the State of Mo.*, 953 S.W.2d 617, 620 (Mo. banc 1997). Therefore, a party who has established sufficient standing to bring a declaratory judgment action has necessarily succeeded in demonstrating that the case is also ripe. *See id.* To establish standing under section 536.053, parties need not show that they are now aggrieved by the rule, but only that they "may be aggrieved" in the future by the rule. Here, appellants "may be aggrieved" by the 303(d) list that subjects them to TMDLs and land use regulation to implement the TMDLs. Thus, under *Missouri* law, the case is ripe for review.

## II.

Having determined that promulgation of the 303(d) list constitutes rulemaking under the MAPA, I would address the merits of the case to determine whether there was compliance with the MAPA's rulemaking procedure.[1] Although the circuit court did not rule on this issue, the facts are undisputed, and this Court is obliged to dispose of the case. Rule 84.14.

The facts, some of which were omitted by the majority, show the following: Prior to adoption of the 303(d) list, respondent MDNR published four public notices specifying the bodies of water to be included on the list and soliciting comments. In none of these notices did MDNR indicate that it was considering the Missouri and Mississippi Rivers for inclusion on the final list to be submitted to the EPA. The first notice was published in January 1998 and contained no reference to the Rivers. In the second notice published in March 1998, the MDNR listed the Rivers as waters that the Sierra Club, *but not the agency*, had recommended for inclusion. No mention of the Rivers was made in the notice issued in May 1998. Then, in August 1998, a final notice was issued that would eventually be submitted to the Commission and in which the MDNR explicitly stated that the Rivers were not being listed "because there are no water quality contaminant violations." Nevertheless, in the September 23, 1998, meeting, the Commission approved a final 303(d) list that included the Rivers.

Section 536.021, RSMo 2000, provides in pertinent part:

> No rule shall hereafter be proposed, adopted, amended or rescinded by any state agency unless such agency shall first file with the secretary of state a notice of proposed rulemaking and a subsequent final order of rulemaking, both of which shall be published in the Missouri Register by the secretary of state as soon as practicable after the filing thereof in that office; . . . .

---

1. In the 2002 legislative session, section 644.036, RSMo, was amended to require expressly that all future 303(d) lists be adopted pursuant to the MAPA's rulemaking procedures, chap. 536. 2002 Mo. Laws 170.

It is well-settled that an agency's failure to follow the rulemaking procedures set out in section 536.021 in adopting a rule renders the rule void. *NME Hospitals*, 850 S.W.2d at 74; *Baugus*, 878 S.W.2d at 42. Here, respondents failed to file anything with the Secretary of State disclosing their intent to place the Missouri and Mississippi Rivers on the 303(d) list. Nor did respondents publish a proposed or final order of rulemaking listing the Rivers in the Missouri Register. Each of these procedural missteps is a violation of section 536.021 and renders the final 303(d) list submitted to the EPA void.

### III.

For these reasons, I would reverse and remand the case for entry of judgment in favor of appellants.