**FORD MOTOR COMPANY,**
Respondent,

v.

**CITY OF HAZELWOOD, Appellant.**

No. ED 83669.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 25, 2005.

Kevin O'Keefe, Clayton, MO, for appellant.

James C. Owen, Chesterfield, MO, for respondent.

PATRICIA L. COHEN, Presiding Judge.

### Introduction

The City of Hazelwood, Missouri, appeals the judgment of the Circuit Court of St. Louis County refunding $1,232,499.00 in license fees plus pre-judgment interest to Ford Motor Company pursuant to Section 139.031, R.S.Mo 2000,[1] and granting declaratory and injunctive relief prohibiting Hazelwood from enforcing its ordinances in a manner violative of the Commerce Clause. Because we find that Ford failed to file a written protest concurrently with the payment of its license fee, as required by Section 139.031, we reverse and remand.

---

1. All citations to the Revised Statues of Missouri ("R.S.Mo") are to R.S.Mo 2000 unless otherwise specified.

### *Statement of the Facts and Proceedings Below* [2]

Ford owns and operates an automobile assembly plant known as the St. Louis Assembly Plant ("SLAP") in Hazelwood, Missouri. At the SLAP, Ford assembles motor vehicles from thousands of parts, most of which come from outside Missouri. Hazelwood imposes a license fee on Ford for the privilege of conducting business within Hazelwood.

In order to conduct a manufacturing business in Hazelwood, Chapter 605.020 of the Hazelwood City Code ("the Code") requires that "every person defined to be a merchant, manufacturer, or miscellaneous service occupation, shall, before going or offering to do business as such, procure from the Director of Finance a license therefor under the provisions of this Chapter." Section 605.120 of the Code requires a merchant or manufacturer to file an application on or before March 16th of each year. The license renewal application form is provided by Hazelwood and the calculation of the fee owed is performed by the taxpayer on the form. The form requires the taxpayer to maintain accounting records adequate to verify the accuracy of the valuation provided.

Section 605.140 of the Code provides that license fees accompanied by "a proper application and attached documentation" are due on or before March 16th of each year. Section 605.130 of the Code governs delinquent license fee applications and provides, in pertinent part, as follows:

B. The taxpayer's securing of an extension of time in which to file shall stay the accrual of penalty, however, an estimated license fee, which is reasonably based upon the previous year's fee, *must* be paid at the time the request for an extension of time is submitted. Upon filing of a completed application for which an extension has been granted, the taxpayer must pay in full any deficiency between the estimated fee previously deposited and the actual fee due. If *the estimated fee paid* by the taxpayer is greater than the actual fee due, the Director of Finance shall refund the *overpayment* to the taxpayer.

(Emphasis added):

Ford's 2002 license application and annual license fee was due and payable by March 16, 2002. By letter dated January 25, 2002, Ford requested an extension of time to file its application asserting, "there is considerable accounting work involved in arriving at our figures and it is necessary that we request an extension of time in which to file." In a letter dated January 29, 2002, Hazelwood's Finance Director, Donnie Bryant, responded as follows:

Before I can approve your request, Ford must pay a reasonable estimate of fees, comparable to last year. Upon receiving the payment, I will forward written notice of our extension of time to file until April 15th. Your actual payment due will be adjusted at the time you file your license application.

On March 8, 2002, Ford forwarded to Hazelwood a check in the amount of $2,554,808.00. In compliance with the Code and Ms. Bryant's correspondence, this amount constituted the same amount Ford had paid as a license fee in 2001. The check was not accompanied by a written protest or challenge. Accordingly, when Hazelwood received Ford's check, the funds were not escrowed, separated, or

---

**2.** Although Hazelwood raises several points in this appeal, the threshold issue is contained in Hazelwood's second point, which challenges the jurisdiction of the trial court. Accordingly, we forego a detailed recitation of the facts and set forth only those facts that are relevant to this issue.

treated as unavailable in connection with preparation of the budget.

Upon receiving Ford's check, Hazelwood granted Ford a license application extension until April 15, 2002. On April 15, Ford submitted its license application along with a protest letter, challenging the gross sales portion of the license fee on grounds that it violated the Commerce Clause, and sought a refund of $1,232,499.00.

On April 23, 2002, Ms. Bryant denied the requested refund, on the basis that the protest was not timely because it did not accompany the March 8th payment. In addition, Ms. Bryant rejected Ford's method of valuing its tax base, as set forth in its April 15th protest letter. Although Hazelwood's denial letter did not contain any notice of a right to appeal, Section 605.170 of the Code establishes a Board of Review for taxpayers challenging decisions of the Hazelwood Director of Finance as well as a fifteen-day deadline from the date of the challenged decision to file a petition for review.

Ford did not appeal to the Hazelwood Board of Review. Rather, Ford filed a four-count Petition for Tax Refund and Declaratory Judgment in the circuit court seeking: "Refunds under § 605.130(B) of the Hazelwood Municipal Code" (Count I); "Refunds under § 139.031, R.S.Mo–Code Violation" (Count II); "Refunds under § 139.031 R.S.Mo–Commerce Clause" (Count III); and "Injunction" (Count IV).[3] In Count IV, Ford incorporated the prior three counts seeking a refund and, in addition, sought a declaration that the "License Fee, on its face or as applied, violates the Commerce Clause" and an injunction prohibiting Hazelwood from implementing the

Code to impose its "License Fee on that portion of a manufacturer's goods attributable to activities from other jurisdictions where the same goods are subject to the same or similar taxation."

Following a bench trial, the trial court entered its Findings of Fact, Conclusions of Law and Judgment. The trial court determined, among other things, that Ford's April 15th protest accompanying its license application was timely and Ford was entitled to a refund in the amount of $1,232,499.00 on Count II, or alternatively, Count III of Ford's Petition. More specifically, the court concluded that because Ford filed its protest letter on the extended due date for the license application, it was timely. The trial court also determined that, as a matter of fact, Ford revised the way it apportioned its fee in its 2003 license application using a three-factor apportionment method and paid $39,779.00 as a license fee. In its order, the trial court found that "[t]he three-factor state apportionment formula submitted by Ford" accomplishes the goal of fair apportionment and preserves Hazelwood's ordinance. The trial court granted the declaratory relief prayed for in Court IV and ordered that "[a]ll companies subject to the tax ... may use a state tax apportionment for its gross sales consistent with the Multistate Tax Compact, [Sections] 32.200, et seq."

Following the court's entry of judgment, Hazelwood appealed.

### Standard of Review

■■■ Hazelwood argues that the trial court lacked subject-matter jurisdiction with respect to all four counts of Ford's

---

**3.** Ford also filed a mandamus petition reiterating the allegations from the Petition and adding that Hazelwood failed to escrow Ford's disputed tax payment as required by

Section 139.031. On Ford's motion, the mandamus petition was dismissed following judgment in favor of Ford on the tax refund action.

Petition and contends that our standard of review is *de novo.* Ford does not dispute Hazelwood's characterization of the issues as implicating subject-matter jurisdiction, but does not agree that our review is *de novo.* Unquestionably, failure to exhaust administrative remedies deprives the trial court of subject-matter jurisdiction. *Toghiyany v. City of Berkeley,* 984 S.W.2d 560, 563 (Mo.App. E.D.1999). Here, the trial court treated Hazelwood's contention that Ford failed to comply with Section 139.031 as a question of exhaustion and, accordingly, subject-matter jurisdiction. As Ford acknowledges, where the facts relevant to subject-matter jurisdiction are uncontested, the court's review is *de novo. Missouri Soybean Ass'n v. Missouri Clean Water Comm'n,* 102 S.W.3d 10, 22 (Mo. banc 2003). Because the facts relevant to Ford's compliance with Section 139.031 were uncontested, namely, the date Ford remitted its license fee payment and the date Ford filed its written protest, our review is *de novo.* We also note that where, as here, a trial court is charged with applying statutory requirements, any such application is a question of law rather than fact. *Jones v. St. Louis County Police Dep't,* 133 S.W.3d 524, 525 (Mo.App. E.D.2004). Accordingly, on this basis as well, the appropriate standard of review is *de novo. Id.*

### Discussion

We consider Hazelwood's second point challenging the trial court's subject-matter jurisdiction first. Hazelwood contends that the trial court erred when it failed to dismiss Ford's Petition on the grounds that Ford failed to file a written protest concurrently with its March 8th payment of the license fee as required by Section 139.031.1. Ford responds that because it filed its protest letter concurrently with its license application as of the date of the extension for the filing of the application, its protest was timely under Section 139.031.1.

Section 139.031, provides, in relevant part, that a "taxpayer desiring to pay *any taxes* under protest *shall, at the time of paying such taxes,* file with the collector a written statement setting forth the grounds on which his protest is based." (Emphasis added). This section applies "to the assessment of taxes collected by city and municipal tax collectors." *Metts v. City of Pine Lawn,* 84 S.W.3d 106, 109 (Mo.App. E.D.2002) (internal citation omitted). Moreover, Section 139.031 has been held to apply to business license fees, and failure to timely file a protest precludes a refund of license fees. *General Motors Corp. v. City of Kansas City,* 895 S.W.2d 59 (Mo.App. W.D.1995).

▮ It is well-settled that Section 139.031 must be strictly construed and enforced. *State ex rel. Nat. Inv. Corp. v. Leachman,* 613 S.W.2d 634, 635 (Mo. banc 1981); *Stanton v. Wal–Mart Stores, Inc.,* 25 S.W.3d 538, 541 (Mo.App. W.D.2000); *Pac–One, Inc. v. Daly,* 37 S.W.3d 278, 281 (Mo.App. E.D.2000). "[T]he statutory sections providing the tax appeal procedure must be meticulously followed." *Adcor Realty v. State Tax Comm'n,* 627 S.W.2d 604, 606 (Mo. banc 1982). As the Supreme Court held in *Buck v. Leggett,* 813 S.W.2d 872, 877 (Mo. banc 1991), "[a] taxpayer's failure to follow the mandate of [Section 139.031.1] has consistently been held to bar his claim of impropriety of any part of the taxes he has paid." We likewise have held that "Section 139.031 provides the taxpayer with an exclusive remedy, and therefore, failure to strictly comply with this section bars recovery of the controverted taxes." *Pac–One, Inc.,* 37 S.W.3d at 281. Such strict construction advances the purpose of Section 139.031, which we have described as balancing the "interests

of taxpayers and collectors by assigning duties and responsibilities to each—and with public policy favoring certainty in revenue collection and discouraging suits for refunds." *Missouri American Water Co. v. Collector of St. Charles County, Mo.,* 103 S.W.3d 266, 270 (Mo.App. E.D.2003).

The Supreme Court considered the required timing of a protest letter in *Leachman, supra. See also B & D Inv. Co., Inc. v. Schneider,* 646 S.W.2d 759, 763 (Mo. banc 1983) ("The letter of protest must be filed 'at the time of paying such taxes' and a letter filed 10 days after such payment is ineffective.") There, the taxpayer, who filed a protest letter ten days after the taxpayer's check for taxes was sent to the taxing authority, argued that although its payment and protest were not concurrent, each occurred prior to the date of delinquency, i.e., the date the taxes were actually due, and therefore its protest was timely for purposes of suit under Section 139.031. *See Leachman,* 613 S.W.2d at 634–35. The taxing authority responded that Section 139.031.1 mandated concurrent payment and protest as a predicate to further proceedings. *See Id.* at 635. Agreeing with the taxing authority, the Supreme Court held that "[Section] 139.031.1 does not permit the filing of a protest letter following the date of payment of taxes as a predicate for a successful protest." *Id.* Clearly, the Supreme Court in *Leachman* flatly dismissed the notion, advanced here by Ford, that a protest that does not accompany the taxpayer's check but is nevertheless filed by the due date for the return (or, as in this case, the application) is timely.

In reaching the result in *Leachman,* the Court relied on the purpose of Section 139.031.1. *Leachman,* 613 S.W.2d at 635 n. 3. Rejecting an overly restrictive definition of the word "payment" proffered by the taxpayer, the Court concluded that "the statutory purpose is to meet the needs for administrative control of the payment-protest-impounding sequence of county revenues." *Id.* The Court additionally noted that "the statutory scheme is apparently designed to aid the Collector in the task of matching protests with payments and to facilitate that office's accounting procedures." *Id.* at 635. In short, the statute focuses on the actual payment of the funds as the event which triggers the requirement of concurrent protest. If, as occurred here, the taxing authority receives a tax payment without a protest then the "payment-protest-impounding sequence" is disrupted and the statutory scheme is frustrated. *See Id.* at 635 n. 3

■ Applying the principles articulated in *Leachman,* it is clear that the timing of Ford's protest letter did not comply with Section 139.031.1. Ford sent Hazelwood a check for $2,554,808.00 on March 8, 2002. The amount represented an estimated fee based upon the license fee paid in 2001. Because Hazelwood was unaware that the funds were disputed, Hazelwood did not impound any portion of the fee. Other than the March 8th payment, Ford made no other license fee payment to Hazelwood at any time. Hazelwood assessed no penalties against Ford. When Ford filed its application for a manufacturer's license on April 15th, no check accompanied it and no payment was made. Rather, in its letter accompanying the application, Ford claimed that it had made an overpayment and "respectfully requests that this amount be returned or, in the alternative, that $1,232,309.00 of *its previous payment* is made under protest." (Emphasis added). Having made its only payment to Hazelwood on March 8th, Ford's license fee was thus, for purposes of Section 139.031.1, paid on March 8th, not April 15th.

Ford argues that because it "filed its protest at the time of its application," its protest was timely. In essence, Ford contends that the extended due date of the license application triggered the protest rather than the date Ford sent Hazelwood its payment. At the heart of Ford's argument is a contention that "payment" occurred only when the license application was filed rather than when it sent its check for an estimated license fee to Hazelwood.

In support of its position, Ford relies solely on *Hamacher v. Director of Revenue,* 779 S.W.2d 565 (Mo. banc 1989), a case construing Section 143.801.1, R.S.Mo 1986, which governs state income tax refund claims. *Hamacher* does not assist Ford. In *Hamacher,* our Supreme Court held that, for purposes of an income tax refund claim, the statute of limitation commences from the date the return was due, regardless of whether the return was filed earlier. *Id.* at 567. *Hamacher,* does not, however, stand for the proposition that a taxpayer who seeks a refund under Section 139.031 may comply with Section 139.031.1 by filing a protest letter on the date the license application is due following an extension rather than on the date the license fee is paid.[4] Indeed, the federal statutory section the Supreme Court found persuasive in *Hamacher,* 26 U.S.C. Section 6513, provides, among other things, that an extension to file a return does not extend the time for *payment* of the tax, consistent with the position Hazelwood maintains here. Although we are not bound by the language in the Internal Revenue Code in interpreting the meaning of the Hazelwood Code and Section 139.031, the Supreme Court, in *Hamacher,* endorsed consistent interpretation in analogous federal and state contexts. Ford's argument that its tax payment was due as of the extended date for filing its application is not consistent with 26 U.S.C. Section 6513.

In addition to its reliance on *Hamacher,* Ford attempts to distinguish this case from *Leachman.* First, Ford claims that while the property tax appeal statutes at issue in *Leachman* can be "harmonized" with Section 139.031.1, the same cannot be said of Hazelwood's Code. Thus, Ford argues, that under the circumstances, it "did its best to attempt to satisfy the requirements of both [Section] 139.031 and the Code." However, neither ignorance of Section 139.031's requirements, confusion, nor circumstances that create obstacles to concurrent payment excuse a taxpayer from literal compliance with Section 139.031. *See Pac–One, Inc.,* 37 S.W.3d at 282 (taxpayer who "had done all it could" not excused from literal compliance); *General Motors Corp.,* 895 S.W.2d at 62 (duty to comply with Section 139.031 not excused by ignorance of its application to specific category of taxes); *Leachman,* 613 S.W.2d at 635 (difficulties created by third party payment of taxes do not excuse concurrent payment obligations).

Ford also seeks to distinguish *Leachman* by contending that the property tax appeal statutes at issue in *Leachman* do not contain a provision for payment of a

---

4. We recognize that Missouri income taxpayers may protest a proposed assessment at any time before an assessment is final by filing a written protest with the director of revenue. *See* Section 143.631, R.S.Mo. However, for a remittance to be treated as a deposit, rather than a payment, it must be accompanied by a written statement which clearly notifies the director of revenue that the funds are to be treated as a deposit. *See* Section 143.631.3,

R.S.Mo. In addition, Section 143.631 distinguishes between the return of a deposit and a claim for a refund. Thus, although Ford relies on *Hamacher,* it seems unlikely that a court construing state income tax refund claims would countenance Ford's attempt to obtain a refund of funds that were not accompanied by any indication that they were to be treated as anything other than a tax payment, as happened here.

deposit, while the Code, Ford contends, contains such a provision. We disagree. Hazelwood's Code permits payment of an estimated fee as a prerequisite to the grant of an extension to file a license application. As discussed in greater detail below, an estimated fee remitted to secure an extension to file a license application is not a deposit, but a payment of a tax liability. Having failed to concurrently protest and pay, Ford is in the identical position of the taxpayer in *Leachman* with respect to Section 139.031.1 compliance.

Nor do we agree, as Ford argues, that to harmonize the Code and Section 139.031.1, we must conclude that Ford's payment of the estimated fee on March 8th was not a payment simply because Ford had not yet precisely calculated its fee due, after extension, on April 15th. Clearly, the Code requires that to obtain an extension of the filing date for the application, an estimated license fee must be *"paid* at the time the request for an extension of time is submitted." Hazelwood Code, Section 605.130 (emphasis added). Moreover, nothing in the Code supports the notion that a grant of an extension to file an application extends the time to pay the fee.

While Missouri courts have not specifically addressed whether an estimated tax payment made with a request for an extension to file a return is a payment [5] or, as Ford argues, a deposit, federal courts have considered analogous issues raised in the context of the Internal Revenue Code. In *Blatt v. United States*, 34 F.3d 252, 256 (4th Cir.1994), the taxpayer argued that a "good faith" remittance of estate tax did not constitute a payment until the estate tax return was filed. More specifically, the taxpayer argued, as Ford does here, that because the amount of taxes due was not precisely determined at the time the remittance was made, taxes could not have been "paid." *Id.* at 256.

Rejecting the taxpayer's argument, the Fourth Circuit articulated a number of principles we find helpful. First, as a general matter, the *Blatt* court held that "the lack of a precise calculation of the amount of taxes . . . does not indicate that an estimated payment is not a payment of taxes." *Blatt,* 34 F.3d at 256. Relying on Internal Revenue Code language, similar to Hazelwood's Code, that when an extension is sought it must be accompanied by an amount "properly estimated as tax" due, the court further held that the tax liability is created at the time required for the filing of the return, without regard to any extension.

The *Blatt* court also considered the taxpayer's purpose in remitting the money. Like Ford, the taxpayer claimed he deposited money to avoid interest and penalties. *Blatt,* 34 F.3d at 257. In addition, like Ford, the taxpayer sought a refund following the filing of the return, claiming that the remittance was, in large part, an overpayment.[6] *Id.* at 256. As the *Blatt* court held, in words equally applicable here, "[i]f the taxpayer treats a remittance . . . as an 'overpayment' for which he seeks a refund, he himself characterizes the remittance as a payment of taxes." *Id.* at 255. By contrast, a deposit "could not, by its very nature, be claimed to be an 'overpayment' and therefore subject to a refund." *Id.*

The United States Supreme Court has also rejected the position implicit in Ford's

---

5. It bears noting, however, that in the context of Missouri's income tax, "payment of the estimated income tax or any installment thereof, shall be considered payment[.]" Section 143.541.7, R.S.Mo.

6. In its April 15th protest letter accompanying its license application, Ford characterized as an "overpayment" that portion of its March 8th payment which it sought as a refund.

argument that there can be no payment of taxes until the exact amount of tax liability has been assessed. *See Baral v. United States*, 528 U.S. 431, 120 S.Ct. 1006, 145 L.Ed.2d 949 (2000). More specifically, in *Baral*, the Supreme Court held that an estimated tax remittance is a payment, rather than a deposit. *See Id.* at 435–36, 120 S.Ct. 1006. In addition, at least six federal circuits have held that remittances accompanying extension requests are payments. *See VanCanagan v. United States*, 231 F.3d 1349, 1353 (Fed.Cir.2000); *Dantzler v. United States Internal Revenue Service*, 183 F.3d 1247, 1252 (11th Cir. 1999); *Ertman v. United States*, 165 F.3d 204, 208 (2d Cir.1999); *Ott v. United States*, 141 F.3d 1306, 1309–10 (9th Cir. 1998); *Gabelman v. Commissioner of Internal Revenue*, 86 F.3d 609, 612–13 (6th Cir.1996); *Weigand v. United States*, 760 F.2d 1072, 1074 (10th Cir.1985).

Ford further claims that holding it to the mandated strict construction of Section 139.031.1 would create the impossible situation "of Ford having to request an extension of time to complete its apportionment accounting but know, in advance, the exact amount of the overpayment and refund request, even though that was the reason for the extension." Ford, however, has failed to indicate how it was precluded from making a protest at the time it paid its estimated tax. Ford was already contemplating renewing its Commerce Clause challenge to the license tax in early 2002.

Furthermore, the crux of Ford's protest is a dispute over the proper valuation methodology for "goods manufactured by [Ford] in the City." The very nature of Ford's protest would have allowed it to file a protest with its estimated fee in March 2002. Indeed, Ford does not contend that the apportionment method it used for its license application on April 15, 2002, which was accompanied with a protest, was not available in March 2002, when it paid its estimated fee without a protest.

Ford's April 15th protest was not timely under Section 139.031.1 because it did not accompany the March 8, 2002 estimated payment. In light of the fact that Ford failed to comply with the requirements of Section 139.031, the trial court erred in awarding Ford a tax refund or declaratory relief under Count II or, in the alternative, Count III.[7] The trial court's award of injunctive relief under Count IV is equally flawed. Count IV consists solely of an incorporation of the first three counts of the Petition, each of which sought a tax refund, and a request for declaratory and injunctive relief based on the first three counts. Because the refund counts fail, Count IV, which is identical to the first three counts, with the exception of the request for an injunction, fails as well.[8] *See General Motors Corp.*, 895 S.W.2d at 63 (court declines to reach Commerce Clause issues where recovery barred by failure to timely protest tax under Section 139.031, R.S.Mo).

7. Although the trial court did not specifically reference Count I in the judgment, Count I seeks the identical relief as Counts II and III. Because Section 139.031 (Counts I and II), provides the exclusive statutory remedy for tax refunds, the trial court had no subject-matter jurisdiction with respect to Count I. Ford also states in Point I of its brief that "§ 139.031 was the only remedy in this particular case."

8. Even if we were to consider the merits of Count IV, we agree with Hazelwood that, based on the trial court's finding that Ford adopted a three factor state apportionment method in its 2003 license application and paid a $39,799.00 license fee, with no evidence of objection from Hazelwood, Ford has failed to establish the presence of a justiciable controversy sufficient to support declaratory or injunctive relief. *See City of St. Louis v. Milentz*, 887 S.W.2d 709, 711 (Mo.App. E.D. 1994).

## Conclusion

We reverse and remand for judgment consistent with this opinion.

KATHIANNE KNAUP CRANE and ROBERT G. DOWD, JR., JJ., Concur.