Jennifer Banks ARNWINE, Appellant,

v.

John M. TREBEL, et al., Respondents.

No. WD 65506.

Missouri Court of Appeals,
Western District.

June 30, 2006.

David G. Sperry, Independence, MO, for appellant.

Juliet A. Cox, Kansas City, MO, for respondents.

Before JOSEPH M. ELLIS, Presiding Judge, HAROLD H. LOWENSTEIN, Judge and PAUL M. SPINDEN, Judge.

JOSEPH M. ELLIS, Judge.

On the morning of October 28, 1999, Appellant Jennifer Banks Arnwine ("Arnwine"), an employee of Waterloo Industries, Inc., sustained severe hand injuries resulting from an accident which occurred when a secondary press machine she was operating at Waterloo's manufacturing plant in Sedalia, Missouri, malfunctioned. At the time of the accident, John M. Trebel, Gerald T. Heinlen, Grant Jones, Kelly Guess, and Steven Hockett (collectively referred to as "Respondents") also worked for Waterloo Industries. Shortly after the accident, Arnwine filed what later turned out to be a successful claim for workers' compensation benefits with the Labor and Industrial Relations Commission of Missouri ("Commission"), which administers

Chapter 287, The Workers' Compensation Law ("WCL").[1]

On October 22, 2004, Arnwine filed a personal injury action in the Circuit Court of Pettis County seeking an award of compensatory and punitive damages against Respondents for their roles in the events of October 28, 1999. On November 29, 2004, Respondents moved for dismissal of all claims against them for lack of subject matter jurisdiction, asserting that, since those claims arose out of Arnwine's on-the-job injuries, Respondents were not subject to civil liability to Arnwine for those injuries under section 287.120, the exclusive jurisdiction provision of the WCL. After briefing and oral argument on the issue of its subject matter jurisdiction over Arnwine's claims against Respondents, the circuit court ultimately entered an "Amended Ruling on Defendants' Motion to Dismiss and Judgment Dismissing Plaintiff's Petition" on May 4, 2005, leading to this appeal, in which Arnwine challenges the circuit court's determination that her claims were barred under section 287.120.

Section 287.120 governs the determination of when an injury falls under the WCL. In pertinent part, it states:

1. Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for personal injury or death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefore whatsoever, whether to the employee or any other person. . . .

2. The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee, his wife, her husband, parents, personal representatives, dependents, heirs or next kin, at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter.

The Missouri Supreme Court has held that the WCL was not supplemental or declaratory of any existing rule, right or remedy, but created an entirely new right or remedy which "is wholly substitutional in character and supplants all other rights and remedies, at common law or otherwise." *Marie v. Standard Steel Works*, 319 S.W.2d 871, 875 (Mo. banc 1959). It provides the exclusive remedy for employees against their employers for injuries covered by its provisions, and subject matter jurisdiction over such matters properly lies only in the Commission. *State ex rel. Taylor v. Wallace*, 73 S.W.3d 620, 621 (Mo. banc 2002). "This immunity from suit [also] extends to employees of the exempt employer, albeit in a more limited fashion." Id. "A motion to dismiss for lack of subject matter jurisdiction is the proper method to raise as a defense to a tort action the exclusive jurisdiction of the Workers' Compensation Law, as provided in Chapter 287." *Sexton v. Jenkins & Assocs., Inc.*, 41 S.W.3d 1, 3 (Mo.App. W.D.2000).

"In determining the question of its subject matter jurisdiction, the circuit court is not only the arbiter of the law, but the facts necessary to decide the question." *Kesterson v. Wallut*, 116 S.W.3d 590, 594 (Mo.App. W.D.2003). Thus, whether the subject matter of an action falls within the exclusive jurisdiction of the Labor and Industrial Relations Commission is a question of fact, resolution of which is left to the sound discretion of the trial court.

---

1. All statutory references are to RSMo 2000. Section 287.010 states that Chapter 287 "shall be known as 'The Workers' Compensation Law.'" For the sake of simplicity, throughout the remainder of this opinion we will refer to it as "the WCL."

*Burns v. Employer Health Servs., Inc.,* 976 S.W.2d 639, 641 (Mo.App. W.D.1998). Its decision on this question may be "based not only on facts appearing of record, but facts adduced by affidavits of the parties, oral testimony, and depositions." *Kesterson,* 116 S.W.3d at 595.

■■■ "Dismissal for lack of subject-matter jurisdiction is proper whenever it appears, by suggestion of the parties or otherwise, that the court is without jurisdiction." *Missouri Soybean Ass'n v. Mo. Clean Water Com'n,* 102 S.W.3d 10, 22 (Mo. banc 2003); *Rule 55.27(g)(3).* "As the term 'appears' [in Rule 55.27(g)(3) ] suggests, the quantum of proof is not high; it must appear by the preponderance of the evidence that the court is without jurisdiction." *James v. Poppa,* 85 S.W.3d 8, 9 (Mo. banc 2002). Where, as here, the facts bearing on the issue are contested, we review the trial court's decision on a motion to dismiss for lack of subject matter jurisdiction for abuse of discretion, *Mo. Soybean Ass'n,* 102 S.W.3d at 22; *Sexton,* 41 S.W.3d at 4. "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *Sexton,* 41 S.W.3d at 4 (internal quotation marks omitted).

Arnwine brings three points on appeal. In her first point, she argues that the trial court erred and abused its discretion in concluding that Respondents had met their burden to prove, by a preponderance of the evidence, that the court lacked subject matter jurisdiction over Arnwine's personal injury claims against Respondents. In Point II, Arnwine asserts that the trial

court erred in granting Respondents' motion to dismiss for lack of subject matter jurisdiction because the court overlooked and/or completely failed to address her claim that one or more of the Respondents had violated section 292.040 and were, therefore, guilty of negligence *per se.* And in her third and final point, Arnwine claims the trial court erred in dismissing her petition as to Respondents Trebel, Heinlen, Jones, and Guess on the grounds they had neither actual supervisory control over her nor knowledge of the circumstances attending her injury and were not present when it occurred.

As noted, our review is for abuse of discretion. The record before the trial court was limited, consisting solely of written materials such as pleadings, affidavits and depositions. Accordingly, we set forth the evidentiary background in detail.

At the time of the accident, Arnwine was working the third shift (12:00 a.m. to 7:00 a.m.) as a press operator at Waterloo Industries' plant in Sedalia. Hockett, who had been employed by Waterloo Industries for more than ten years, was Arnwine's "group leader." As group leader, Hockett was Arnwine's immediate supervisor. Hockett's supervisor was Guess, who had been employed by Waterloo for over twenty years and served as the secondary press department supervisor for the third shift. The record is bereft of any information regarding Trebel, Heinlen, and Jones other than the allegations in the petition that they were at all relevant times employed by Waterloo Industries, Inc.[2]

At approximately 3:30 a.m., Hockett came over to the secondary press machine Arnwine was operating and asked her to

2. During oral argument of Respondents' motion to dismiss before the trial court, counsel for Arnwine averred that Jones was the overall supervisor or superintendent for the entire Sedalia plant at the time of the accident, while Heinlen was the Chairman of the Board of Directors of Waterloo Industries and Trebel was the company's CEO. However, the record proper contains no proof of counsel's assertions.

run a few (about 60) parts that were part of a "rush job" for the welding department. Following Hockett's instructions, Arnwine left her previous machine and began operating machine number 1206, a large secondary press which was about eleven feet high and six feet wide. Machine 1206 housed a press bed and removable die, on which the operator places a piece of metal. A "ram head" hovers above the press bed, which, when activated by the machine's operator using a foot pedal, cycles downward with considerable electrically-accelerated force to press the metal into a particular shape, as determined by the die in use.

Machine 1206 was equipped with a safety device called a "light curtain." The light curtain consists of two or more lamps or lasers on either side of the press bed that engage each other to form a wall of light between the operator and the press. This device is designed to immediately terminate the machine's function, even in mid-cycle, in the event any object, including any portion of the operator's body, breaks the plane of the light curtain. Prior to the accident, Arnwine checked the light curtain safety mechanism on Machine 1206 pursuant to standard procedure, finding it to be "in perfect working order."

According to Arnwine's sworn affidavit of December 20, 2004, "[f]rom the very first piece [she] ran" after commencing her duties on Machine 1206, "problems with the press became evident" to her, because when she "stepped on the foot pedal to activate the cycle, the press seemed to 'stick' or 'lag' as it came down to bend the metal piece." Arnwine notified Hockett that "the machine was not working right, it was taking too long for the machine to cycle, and these parts were going to take longer than he expected."

As her group leader, it was Hockett's duty to investigate the problem reported by Arnwine. He did so, and, as he explained during his October 19, 2004 deposition in Arnwine's workers' compensation case, noticed that Machine 1206 had "a problem and, you know, it just wasn't normal. . . . It had hesitation and ran slow. It just wasn't consistent . . . [and] was not functioning correctly or properly."

While Arnwine waited in front of the machine, Hockett went around to the back of the machine and observed a bolt or a wedge that appeared to him to be loose. Hockett then told Arnwine that he planned to fix the problem with Machine 1206 himself. Hockett then used an open-ended half-inch wrench to tighten the nut that attached the loose-looking wedge to a spring-loaded shaft while the machine's flywheel was in motion and its motor was on, believing that the fix was a simple one. As Hockett explained it:

Q.: What do you recall about October 28th?

A.: It was just a normal day. The press had a problem. It seemed like a simple fix to me and I attempted to fix it.

Q.: Okay. What was the simple fix?

A.: Well, I thought, you know, the wedge was loose. So I put it back where it was supposed to be, so I thought.

\* \* \*

Q.: Okay. Describe for me what you did on the wedge that night.

A.: It was loose. There was a nut and I tightened the nut back and tried to put it back in place because I thought that's why the—I mean it was just loose and it was just not—I thought that's where the inconsistency was coming from.

Q.: Okay. So if I'm understanding you correctly, the machine was malfunc-

tioning, okay. It had hesitation and was running slow; is that correct?

A.: Yes.

Q.: Okay. And you thought that you could adjust the wedge; is that correct?

A.: Yeah.

Q.: Okay. And so how did you set about to do that?

A.: I got a wrench and I tightened it back.

Hockett acknowledged in his deposition that he had never performed such an adjustment before. His deposition testimony further revealed that he had no hands-on training or written instruction regarding the "adjustment" he had attempted to make:

Q.: Was there a written procedure that set out adjustments of this wedge or bolt by wrench that you're aware of?

A.: No.

Q.: Okay. Had anyone ever taught you to do that in hands-on instruction?

A.: No.

Hockett then directed Arnwine, who had been standing and waiting at the front of the machine, to depress the foot pedal to initiate a press cycle. The ram head cycled down, struck and bent the metal part that was lying in the press bed, and moved back up, after which Arnwine removed the part from the press bed and replaced it with a new, unbent piece of metal. Arnwine noticed that although the press "cycled a little better" this time, it "was still not right." This process was repeated several more times, after which Arnwine observed that "the press cycled worse than

ever." When asked what happened shortly after he had finished tightening the wedge, Hockett stated that he noticed that the ram head was "drifting over." [3]

A.: It [the ram head] cycled once and did not stop at the top.

Q.: Okay.

A.: It did what we call drifting over.

Q.: Okay. And what do you mean by drifting over?

A.: Just like the momentum of the press slowed down but it just falls. You know, it doesn't stop at the top. It just rolls over. Sometimes it's just a little ways.

Q.: Explain this process to me then of drifting over, okay? How fast does this head come down to the bed?

A.: I have no idea.

Q.: You didn't observe it?

A.: There is no speed indicator or anything on the press I mean.

Q.: Okay. All right. And then at least you know that when the machine head came down to the bed then it came down on [Arnwine's] hand, is that correct?

A.: Yes.

Q.: Okay. What do you recall next occurring?

A.: Her screaming.

The reason Arnwine screamed is that, while reaching into the press bed to remove the bent metal part from the final test run, the ram head dropped down in "free fall," trapping her left hand underneath the head and severing four of her fingers on that hand.[4] After hearing Arn-

---

**3.** During his deposition, Hockett acknowledged that since it was "drifting over," Machine 1206 was not performing "the normal cycle process" and had a "problem." Hockett also testified that he didn't know if he "did anything else to the machine, like, you know,

I don't remember if I tried to slow the press down or speed it up. I don't remember."

**4.** "Free fall" means that the ram head did not cycle down with its usual (*i.e.*, electrically-

wine scream, Hockett rushed over to her and saw Arnwine with her left hand caught between the press bed and the ram head. He immediately depressed an override button on the front of the machine, which lifted the ram and freed her hand. After retrieving her four severed fingers (two of which were still attached to the ram head of Machine 1206) and placing them on ice in a cup, co-workers hurried Arnwine to the plant safety office and then to the emergency room at Bothwell Hospital, from which she was transported by helicopter for further emergency treatment. Meanwhile, plant maintenance workers disabled and locked down Machine 1206 for later inspection and investigation by plant maintenance and safety personnel as to the cause of the accident.

Affixed to Machine 1206 at the time Hockett made the adjustments to the machine was a yellow warning sign, which stated, in relevant part: "Never Install Dies or Service This Machine With the Flywheel in Motion and/or the Motor On." The record also contains the October 19, 2004 deposition of Hockett's supervisor, Kelly Guess, in Arnwine's workers' compensation case. In that deposition, Guess described the normal procedure to be followed under these circumstances:

Q.: On October 28th of 1999 was there any specific procedure in effect in regard to when a machine malfunctioned or misfunctioned in operation?

A.: Sure. If an operator determined that a machine wasn't functioning properly whether it be speed, noise, part malfunction, form, whatever, they were to stop and report it to setup and the group leader, most generally the group leader. Sometimes it's setup. Sometimes the setup man can take care of that quickly and get

things back in order or contact the supervisor and we come evaluate the situation and see if there's an abnormality there that we feel should be taken care of, and chances are we are going to have it checked out regardless and the machine will stay down until maintenance checks it out and it's given a clean bill of health where we can go back to work.

Q.: And then what is the procedure for the machine to be shut down for maintenance?

A.: If a machine is defective or we feel that it may have a problem, basically we shut it down and call maintenance and they will come over as quickly as possible and evaluate the problem and confer with you to see what the problem is and look at it. Sometimes they have to dry run it. Sometimes they don't know exactly what to do but a work order has to be written.

Q.: Is that the procedure that should have occurred October 28th of 1999?

A.: I would assume that [Hockett] should have called maintenance.

Guess also specifically testified that tightening or loosening the nut Hockett tightened was an act that was supposed to be left "to maintenance. It's something that we [i.e., non-maintenance personnel] are not to mess with, you know."

Q.: In other words, it was your conclusion it was something Mr. Hockett should not have been adjusting or messing with as you indicated?

A.: Exactly.

accelerated) force, but moved downward on its own under the effect of gravity.

Q.: And it was something that should have been left to maintenance; is that correct?

A.: Exactly.

Guess went on to say that group leaders such as Hockett did not have any written procedures for adjusting the nut Hockett undertook to tighten, because that was the responsibility of plant maintenance personnel:

Q.: The procedure governing or controlling or authorizing the group leader's work on this kind of machine such as press 1206, is this a written procedure?

A.: There is a basic setup and procedure for setting the rams and setting tooling and that kind of thing. Yes, there is a written procedure for that.

Q.: Is there a written procedure for adjusting this nut on the brake assembly that you have testified to here?

A.: Maintenance has probably got one. We don't.

Q.: That's a maintenance procedure. It's not something that's under your general supervision?

A.: No, it would be under factory specifications, I'm sure.

Arnwine also averred in her affidavit that she was surprised by Hockett's decision to repair the machine himself because "[n]ormally, the machine would be shut down and either someone from maintenance or tool and die would be called in to fix a problem like this." Her affidavit further states that she "assumed he [Hockett] knew what he was doing" when he decided not to shut the machine down and call maintenance, but to make the adjustments himself. In this regard, Guess testified that machine operators assume that when a supervisor is telling them to do something, that it is safe to do so and that such is implied in the relationship between the operator and the group leader or supervisor.

Plant maintenance and safety personnel subsequently conducted an inspection of the machine, as well as an investigation of the accident. As related by Guess, this investigation revealed not only that Hockett had attempted to perform adjustments on Machine 1206 that he shouldn't have,[5] but also that he had done so without knowing one way or the other whether it would make the machine unsafe for Arnwine to operate:

A.: Well, we found out—I found out through [the] investigation that Steve [Hockett] had made some adjustments to the press, some that really exceeded his ability that he shouldn't have. Actually it should have been a maintenance problem. .... I know he wasn't aware of what could happen by messing with it [Machine 1206].

\* \* \*

A.: We realized the mistake then [after the investigation], you know. Steve [Hockett] never tried to hide what he did. Nobody tried to hide.

Q.: And what we are talking about is his statement that he had adjusted that

---

**5.** The "adjustment" Hockett actually made to the wedge involved a critically important assembly within Machine 1206—namely, the ram head's braking mechanism, which controls the speed of the flywheel and keeps the ram head suspended above the press bed between cycles. Hockett's deposition testimony clearly demonstrates that at the time he made the "adjustment," he knew of the relationship between the wedge and the ram head's braking mechanism. As he explained it: "The wedge, it goes up and opens the brake and lets the press run and stops the press."

brake bolt, brake nut, is that what you are saying?

A.: Yes.

Based on this factual record, the trial court concluded that the WCL was Arnwine's exclusive remedy and that it lacked subject matter jurisdiction over Arnwine's claims for personal injuries against the Respondents and, therefore, dismissed her petition as to all five Respondents.

■ At the outset, and contrary to Arnwine's claim in her third point, we hold that the trial court properly dismissed Arnwine's petition as to Respondents Trebel, Heinlen, Jones, and Guess. With respect to them, the petition alleged nothing more than that they were "employees and supervisors" of Arnwine. Standing alone, this is wholly insufficient to overcome the bar of immunity. *See Lyon v. McLaughlin*, 960 S.W.2d 522, 527 (Mo.App. W.D. 1998). Arnwine did not allege that Trebel, Heinlen, or Jones were present at Waterloo Industries' Sedalia plant when she was injured, and neither the petition nor anything else in the record suggests that any of the Respondents except Hockett were present when the accident occurred, took any action that caused or contributed to cause the accident, or directed Arnwine at any time to take any action that would put her in harm's way. As correctly observed by the trial court in its judgment, Arnwine also failed to adduce any evidence whatsoever that Trebel, Heinlen, or Jones had any "actual supervisory control over [Arnwine] or knowledge of the alleged situation out of which Plaintiff's injuries are alleged to have occurred." Similarly, the court correctly found that while she did adduce evidence that "Guess was in the plant at the time of Plaintiff's injuries, he was not near and had no knowledge of facts and circumstances or possible machinery malfunction until later." Accordingly, the trial court's judgment dismissing the petition as

to Trebel, Heinlen, Jones and Guess is affirmed.

Hockett, however, presents an entirely different situation. As to him, Arnwine's petition alleged that Hockett performed "affirmative negligent acts" creating "more than general work place dangers" in that he "ordered [Arnwine] to continue to operate the malfunctioning machine press and he would attempt to adjust and correct the problem himself"; made "the decision to use machine press number 1206 by ordering [Arnwine] to operate the machine when [he] knew or should have known of the machine's defective and malfunctioning condition"; and failed to warn her about the risk of injury "that could occur when [she] was instructed to operate machine press number 1206 in the defective and malfunctioning condition." The petition further alleged that, as "a sole result of Hockett's instructions and orders, [Arnwine] operated machine press number 1206 and was injured." In seeking punitive damages for the aggravating circumstances attending her injuries, the petition also averred that Hockett's "acts and omissions" were "wanton, willful, callous, [and] reckless."

In her first point, Arnwine argues that the trial court erred and abused its discretion in granting Respondents' motion to dismiss for lack of subject matter jurisdiction as to Hockett because the facts outlined *supra* were sufficient to establish an exception to the exclusivity provisions of the WCL as pled in her petition in that they amounted to "something more" than Hockett's negligent failure to carry out Waterloo Industries' duty to provide and maintain a safe workplace.

■ As noted *supra*, section 287.120 of the WCL provides employers with immunity from common law liability for breaches of the duty to maintain a safe

workplace. *Taylor,* 73 S.W.3d at 621 & n. 5; *State ex rel. Hartman v. Kintz,* 832 S.W.2d 9, 10 (Mo.App. E.D.1992). This immunity extends to any employee charged with carrying out the employer's duty in that regard, albeit in a more limited fashion. *Taylor,* 73 S.W.3d at 621; *State ex rel. Badami v. Gaertner,* 630 S.W.2d 175, 180 (Mo.App. E.D. banc 1982). " 'Charging the employee chosen to implement the employer's duty to provide a reasonably safe place to work merely with the general failure to fulfill that duty charges no actionable negligence. *Something more* must be charged.' " *Taylor,* 73 S.W.3d at 622 n. 8 (quoting *Badami,* 630 S.W.2d at 180). Thus, a co-employee's failure to perform a duty delegated to him by his employer does not give rise to a cause of action by another employee who is injured because of the failure. *Badami,* 630 S.W.2d at 180; *see also Lyon,* 960 S.W.2d at 525.

■■■ However, an injured employee may sue a co-employee in the circuit court if he or she alleges that the fellow worker did "[s]omething more" beyond the breach of the duty to maintain a safe workplace. *Badami,* 630 S.W.2d at 180. The reason for this is clear: "Something 'extra' is required beyond a breach of his duty of general supervision and safety, *for that duty is owed to the employer, not the employee.*" *Id.* at 179 (emphasis added); *see also Craft v. Scaman,* 715 S.W.2d 531, 536–37 (Mo.App. E.D.1986) (emphasis added) (observing that a co-employee "is not liable merely for breaching a duty that the *employer* owed the injured employee."). "Whether or not a personal duty exists is a matter of law and is necessarily dependent on the particular facts and circumstances of each case." *Risher v. Golden,* 182 S.W.3d 583, 587 (Mo.App. E.D.2005).

For these reasons, Missouri appellate courts have held that the required "some-thing more" includes any " 'affirmative negligent acts' " by a co-employee that are outside the scope of the co-employee's duty to carry out his employer's responsibility to provide a safe workplace. *Taylor,* 73 S.W.3d at 621–22 (quoting *Kelley v. De-Kalb Energy Co.,* 865 S.W.2d 670, 672 (Mo. banc 1993)); *see also Hedglin v. Stahl Specialty Co.,* 903 S.W.2d 922, 926 (Mo. App. W.D.1995).

Because the question of what constitutes an "affirmative negligent act" or "something extra" is not susceptible to precise definition, the co-employee liability rule has been developed and applied over the years "on a case-by-case basis with close reference to the facts in each individual case." *Taylor,* 73 S.W.3d at 622; *see also Sexton v. Jenkins & Assocs.,* 152 S.W.3d 270, 275 (Mo. banc 2004) (Teitelman, J., concurring). However, the courts have recognized the following general rule: "In cases that have recognized the 'something more' element has been met, the supervisor had personally participated in the 'something more' by directing the employees to engage in dangerous conditions that a reasonable person would recognize as hazardous and beyond the usual requirements of the employment." *Lyon,* 960 S.W.2d at 526; *State ex rel. Larkin v. Oxenhandler,* 159 S.W.3d 417, 423 (Mo. App. W.D.2005); *see also Groh v. Kohler,* 148 S.W.3d 11, 15, 16 (Mo.App. W.D.2004) (holding that the "something more" requirement was met when, after a factory worker complained to her supervisor that her machine was not operating properly, the worker's supervisor told her to go back to work, "quit whining," and "just deal with it.").

■■■ If Arnwine's petition and supporting evidence sufficiently alleged and established that Hockett committed affirmative negligent acts resulting in injury to Arn-wine from dangerous conditions that a

reasonable person would recognize as hazardous beyond the usual requirements of Arnwine's employment, then the "something more" test was satisfied and Arnwine's cause of action against Hockett should not have been dismissed. This is so because under those circumstances, Arnwine would have properly alleged that Hockett breached a duty he owed *not to his employer, but to Arnwine herself.*

The creation of a hazardous condition is not merely a breach of an employer's duty to provide a safe place to work.... Such acts constitute a breach of personal duty of care owed to plaintiff. These actions may make an employee/supervisor liable for negligence and are not immune from liability under the workers' compensation act.

*Tauchert v. Boatmen's Nat'l Bank of St. Louis,* 849 S.W.2d 573, 574 (Mo. banc 1993); *see also Quinn v. Clayco Constr. Co.,* 111 S.W.3d 428, 432 (Mo.App.E.D. 2003) (noting that a personal duty of care " 'will arise out of circumstances where the co-employee engages in an affirmative act, outside the scope of employer's non-delegable duties, directed at a worker, increasing the risk of injury' "). Under such circumstances, "the co-employee owes a personal duty to use ordinary care and to refrain from behavior that might reasonably be foreseen to cause harm to another employee." *Risher,* 182 S.W.3d at 587.

■ From the trial court's judgment, it is apparent that the trial court misinterpreted and misapplied the law in this case by applying the wrong legal standard in reaching its decision with respect to Hockett. The standard of foreseeability declared and applied by the trial court was as follows: "The law requires a personal, affirmative act upon a co-worker or supervisor which constitutes a proximate cause of the injury which because of the personal conduct made it practically inevitable that

injury would occur to Plaintiff to take the conduct outside the protection of the Workers' Compensation Act." Later in its judgment, the trial court found that Arnwine had failed to present sufficient evidence that Hockett had done anything "which he knew or should have known was virtually certain or was even likely to cause [Arnwine] to be injured." This was error, because Missouri law imposes no requirement that an injured employee establish that his or her injury was a "practically inevitable" or "virtually certain" consequence of a co-employee's negligence to give rise to a personal duty of ordinary care. Rather, as illustrated by the cases cited and discussed *supra,* the test is whether the co-employee directed or caused the plaintiff "to engage in dangerous conditions that a reasonable person would recognize as hazardous and beyond the usual requirements of the employment." *Lyon,* 960 S.W.2d at 526. In other words, the test is whether the co-employee's actions were outside the scope of his or her duty to carry out the employer's responsibility to provide a safe workplace. *Taylor,* 73 S.W.3d at 621–22 (citing *Kelley,* 865 S.W.2d at 672).

The trial court's judgment as to Hockett is reversed. The trial court erred as a matter of law and applied the wrong standard to the facts in determining that "something more" had not been established. The cause is remanded to the trial court to apply the proper legal standard to the facts in determining whether "something more" on the part of Hockett has indeed been established. In all other respects, the judgment is affirmed.

All concur.