Millard **ARBOGAST** and **Zoie Helms, Respondents,**

v.

**CITY OF ST. LOUIS, Appellant.**

**No. ED 90137.**

Missouri Court of Appeals, Eastern District, Division One.

May 19, 2009.

---

James M. Martin, Saint Louis, MO, for Respondents.

Stephen J. Kovac, City Counselor, Maribeth McMahon, Assistant City Counselor, Saint Louis, MO, for Appellant.

## OPINION

GLENN A. NORTON, Judge.

The City of St. Louis appeals the judgment entered upon a jury verdict awarding Millard Arbogast and Zoie Helms ("Plaintiffs") $65,000.00 on their wrongful demolition claim. The City asserts that the trial court did not have subject-matter jurisdiction over Plaintiffs' claim because Plaintiffs failed to exhaust their administrative remedies before filing suit. We affirm.

## I. BACKGROUND

### A. Relevant Facts

In June 2000, Plaintiffs purchased and moved into property which was located at 210–212 Quincy Street in the City's 11th Ward. A fire caused substantial damage to the property in May 2001. Subsequently, the City determined that the property should be condemned and potentially demolished. After the City demolished the property, Plaintiffs filed a claim against the City for wrongful demolition. The issue in this appeal is whether Plaintiffs were excused from exhausting their administrative remedies (appealing the City's decision to condemn and potentially demolish the property to the City's Board of Building Appeals) because the City failed to provide Plaintiffs with notice and an opportunity to be heard in accordance with the requirements of due process. The following facts are relevant to the determination of this issue.

### 1. Events Prior to the City's Decision to Condemn

Plaintiffs moved out of the Quincy property a few days after the May 2001 fire, and moved into an apartment located at 3404 Cherokee Street. Plaintiffs then filled out a form with the post office to reflect their change in address. By July 2001, mail addressed to Plaintiffs at the Quincy address was returned to the sender by the post office. Additionally, mail returned to the sender bore a sticker which notified the sender of Plaintiffs' new Cherokee address. From July 2001 through July 2002, Plaintiffs received several pieces of mail at the Cherokee address that had been originally addressed to them at the Quincy address, including mail sent from City Divisions other than the Building Division.

Throughout the summer of 2001, Plaintiffs worked on repairing damage to the property that had been caused by the fire. Plaintiffs repaired the roof, removed burned materials from the home, and put up braces, two-by-fours, tarps, and plywood boarding. During the summer of 2001, Plaintiffs had problems with squatters on the property who would take down the plywood boarding from the outside of the home. Plaintiffs replaced the boarding on multiple occasions.

The property was also boarded-up by the City. An invoice from the City's Forestry Division mailed to Plaintiffs for boarding materials reflected that the City boarded-up the property on August 14, 2001. Although the invoice was originally addressed to Plaintiffs at the Quincy address, Plaintiffs received the invoice at their Cherokee address. A photograph taken by a worker for the City's Building Division on October 4, 2001, revealed that the property was no longer boarded-up.

### 2. The City's Decision to Condemn

On October 16, 2001, Marsha Skaggs, a building inspector for the City's Building

Division, inspected the outside of the property. From her inspection, she determined that the property's windows, roof, and interior structure violated provisions of the City's building code, and therefore, the property should be condemned for use and occupancy. Although it is unclear from the record whether the property was boarded-up on October 16, 2001, photographs reflect that the property was boarded-up as of October 19, 2001.

### 3. The City's Notice of Condemnation and Potential Demolition

On October 19, 2001, the City's Building Division served notice of condemnation and potential demolition on Plaintiffs by posting and regular mail as set forth in section 119.2 of City Ordinance No. 64771.[1] The Building Division posted a copy of the notice on the outside of the property. The inspector was at the property when the posting took place. The Building Division also mailed a copy of the notice by regular mail, postage prepaid, to Plaintiffs' Quincy address, which was the address recorded in the City Assessor's Office.

The notice stated that the property was condemned for use and occupancy because its unsafe condition violated provisions of the City's building code. The notice also stated that Plaintiffs must remedy the violations or appeal the decision to condemn to the Board of Building Appeals by October 29, 2001. Finally, the notice provided that if Plaintiffs failed to remedy the violations or appeal the decision to condemn within the time specified, the City would proceed under the authority of the building code to have the unsafe conditions of the property "abated by demolition work and/or whatever work deemed necessary to secure public health, safety and welfare."

Plaintiffs did not remedy the building code violations and never appealed the decision to condemn and potentially demolish the property to the Board of Building Appeals. Plaintiffs testified that they never saw the notice posted on the property and that they never received the mailed notice.

The inspector testified about her experience with giving notice and about the City's records and photographs of the property. At the time of her inspection of Plaintiffs' property, the inspector was responsible for inspecting properties located in the City's 11th Ward. The inspector stated she was aware that squatters who wanted to live in condemned City properties would tear down boards and condemnation notices from the outside of those properties. She confirmed that "it wouldn't be unusual" for boards to be taken down from the properties, and that it was "quite common" for squatters or vandals to take down condemnation notices from the outside of properties immediately after she posted them as she was walking back to her car. The inspector also confirmed that the City's records and photographs indicated that: (1) squatters took down boards from the outside of Plaintiffs' property; and (2) "at least two separate board-ups" of the property took place before the City posted notice on October 19, 2001. Based on the City's invoice for boarding materials, the inspector presumed that the first board-up took place on August 14, 2001. Additionally, the inspector confirmed that the City's photographs, which reflected that the property was not boarded-up as of October 4, 2001, but was boarded-up again as of October 19, 2001, indicated that a second board-up took place between October 4 and 19.

1. Section 119.2 of City Ordinance No. 64771 provides forms of service for notice of condemnation, including service by posting at the property and regular mail. Section 119.2 is set out in full in footnote 3 of Section II(B)(2) below.

The inspector and Sheila Livers, the demolition supervisor for the City's Building Division, testified about the City's procedure for mailing condemnation notices. According to their collective testimony, the Building Division mails notices to City residents at their address listed in the City Assessor's records even if: (1) the Division knows that the property is unoccupied; (2) the Division learns from the post office that the residents' address has been changed; and (3) the Division learns the residents' new address from the post office. The inspector and the supervisor stated the Building Division followed its procedure in this case when it mailed the condemnation notice to Plaintiffs at the Quincy address.

Further evidence in the record confirms these procedures were followed in this case. The evidence shows that prior to demolition, the supervisor sent Plaintiffs' condemnation file and a memorandum to an Associate City Counselor in the City Counselor's Office. The condemnation file sent by the supervisor to the Associate City Counselor included a copy of the October 19, 2001 condemnation notice mailed to Plaintiffs at the Quincy address by the Building Division. The memorandum stated in relevant part that: (1) the property was "probably ... a couple weeks away from being wrecked"; and (2) "[a]ll letters were returned yet sent to owner of record." According to the supervisor's testimony, her statement to the Associate City Counselor that, "[a]ll letters were returned yet sent to owner of record" meant that, "all of the letters that were sent out by [her] office were returned," and "hadn't been sent on to the forwarding address at 3404 Cherokee...."

## B.  Procedural Posture

The City demolished the property on February 22, 2002. Subsequently, Plaintiffs filed a wrongful demolition claim against the City. The City asserted in its answer that Plaintiffs' claim should be dismissed for lack of subject-matter jurisdiction because Plaintiffs failed to exhaust their administrative remedies. A jury trial took place from April 16–18, 2007. At the beginning of the trial, the City renewed its jurisdictional argument in an oral motion to dismiss. The trial court denied the City's motion to dismiss, implicitly finding that the trial court had subject-matter jurisdiction over Plaintiffs' wrongful demolition claim. Although the trial court left open the possibility that it could change its ruling after proceeding with trial, it did not do so. Additionally, the trial court did not specify at any point in the proceedings the facts upon which it relied in denying the City's motion to dismiss and thereby implicitly found that the trial court had subject-matter jurisdiction. The jury awarded Plaintiffs $65,000.00 on their wrongful demolition claim, and the trial court entered judgment accordingly. Thereafter, the City filed a post-trial motion, upon which the trial court did not rule. The City appeals.

## II.  DISCUSSION

In its sole point on appeal, the City maintains that because Plaintiffs failed to exhaust their administrative remedies, the trial court erred in denying its motion to dismiss Plaintiffs' wrongful demolition claim for lack of subject-matter jurisdiction. We disagree.

## A.  Standard of Review

Dismissal for lack of subject-matter jurisdiction is appropriate when it appears, by suggestion of the parties or otherwise, that the court is without jurisdiction. *Missouri Soybean Association v. Missouri Clean Water Commission*, 102 S.W.3d 10, 22 (Mo. banc 2003); Rule

55.27(g)(3).[2] The quantum of proof necessary is not high; it must only appear by a preponderance of the evidence that the court is without jurisdiction. *Missouri Soybean Association,* 102 S.W.3d at 22.

■ Whether a trial court has subject-matter jurisdiction generally "is a question of fact left to the sound discretion of the trial court." *Id.* In determining whether it has subject-matter jurisdiction, the trial court may consider the facts alleged in the petition and evidence adduced by affidavits, oral testimony, depositions, and exhibits. *Graham v. Geisz,* 149 S.W.3d 459, 461 (Mo.App. E.D.2004); *Brazilia, L.L.C. v. Collector of St. Louis County,* 117 S.W.3d 704, 706 (Mo.App. E.D. 2003); Rule 55.28.

■ The trial court's ruling on a motion to dismiss for lack of subject-matter jurisdiction will not be reversed on appeal absent an abuse of discretion. *Missouri Soybean Association,* 102 S.W.3d at 22. A ruling constitutes an abuse of discretion when it "is clearly against the logic of the circumstances presented to the court and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *Romero v. Kansas City Station Corp.,* 98 S.W.3d 129, 137 (Mo.App. W.D.2003) (internal quotations omitted).

## B. The Trial Court did not Abuse its Discretion in Denying the City's Motion to Dismiss Plaintiffs' Claim for Lack of Subject–Matter Jurisdiction

It is undisputed that Plaintiffs failed to exhaust their administrative remedies before filing their wrongful demolition claim against the City. Plaintiffs did not remedy the building code violations or appeal the City's decision to condemn to the Board of Building Appeals by October 29, 2001, or any time thereafter.

■ It is a well-established rule that parties must exhaust their administrative remedies before a court has subject-matter jurisdiction to review the action complained of. *C.S., Jr. v. L.K.M.,* 73 S.W.3d 852, 855 (Mo.App. S.D.2002). But that rule does not apply when the government fails to provide parties with notice and an opportunity to be heard in accordance with the requirements of due process. *Id.* at 855–56; *See also Meehan v. Patchogue–Medford School District,* 29 F.Supp.2d 129, 133–34 (E.D.N.Y.1998). Thus, the question of whether the trial court had subject matter-jurisdiction depends upon whether Plaintiffs' failure to exhaust administrative remedies is excused by the City's failure to provide adequate notice.

### 1. Constitutional Requirements for Adequate Notice

■■ While "[d]ue process does not require that a property owner receive actual notice before the government may take his property," the government must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers,* 547 U.S. 220, 226, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006) (internal quotations omitted). Accordingly, parties who have been deprived of a property interest are excused from exhausting their administrative remedies, and a court has subject-matter jurisdiction over their claim, when the government fails to provide the parties with notice, reasonably calculated under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections.

---

**2.** All references to Rules are to Missouri Supreme Court Rules (2009).

*Id.*; *C.S., Jr.*, 73 S.W.3d at 855–56; *See also Meehan*, 29 F.Supp.2d at 133–34.

■■■ The U.S. Supreme Court has provided guidance for determining whether the government has provided parties with constitutionally sufficient notice. *See Jones*, 547 U.S. at 223–239, 126 S.Ct. 1708. "[W]hen notice is a person's due ... the means employed *must be* such as one desirous of *actually informing* the absentee might reasonably adopt to accomplish it." *Id.* at 229, 126 S.Ct. 1708 (internal quotations omitted) (emphasis added). "[T]he notice required will vary with circumstances and conditions." *Id.* at 227, 126 S.Ct. 1708 (internal quotations omitted). Generally, notice is constitutionally sufficient if it was reasonably calculated to reach the intended recipients at the time of attempted service. *See generally id.* at 226–27, 126 S.Ct. 1708 (noting that U.S. Supreme Court cases that have "deemed notice constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent" involved circumstances where the government "heard nothing back indicating that anything had gone awry"). However, if the government becomes aware prior to a taking that its attempt at notice has failed, due process requires the government to take further reasonable steps if any were available. *Id.* at 225–239, 126 S.Ct. 1708.

We must, in light of these guiding principles, determine whether the City's notice was reasonably calculated under the circumstances to apprise Plaintiffs of the condemnation and potential demolition of their property and afford them an opportunity to present their objections.

**2. The City Failed to Provide Plaintiffs Adequate Notice**

■■■ In this case, the only notice of condemnation and potential demolition provided by the City that possibly afforded Plaintiffs an opportunity to present their objections by explaining the administrative remedies available to Plaintiffs took place on October 19, 2001. On that date, the City's Building Division served notice by posting and regular mail as set forth in section 119.2 of City Ordinance No. 64771.[3] A worker with the Building Division posted a copy of the notice on the property, and mailed a copy of the notice by regular mail, postage prepaid, to Plaintiffs' address recorded in the City Assessor's Office (the Quincy address). Plaintiffs testified that they never saw the notice posted on the property and that they never received the mailed notice.

**a. The City's Posted Notice was not Reasonably Calculated to Reach Plaintiffs at the time of Attempted Service**

We find that *Greene v. Lindsey*, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982), is instructive in determining whether the City's posted notice was reasonably calculated to reach Plaintiffs at the time of attempted service.

In *Greene*, the U.S. Supreme Court examined a Kentucky statute which provided that in a forcible entry or detainer action, service of process could be made by the state by posting notice on the door of the

---

**3.** Section 119.2 of City Ordinance No. 64771 provides that:

Notice [of condemnation] shall be·served in one of the following ways:
  1. Deliver direct to owner(s).
  2. Posting a copy of said notice upon the building, structure or premises.

  3. Mailing a copy of said notice by regular mail, postage prepaid, direct to owner(s)' place of business or the address currently recorded in the Assessor's Office of the City of St. Louis.[or]
  4. Publication in a newspaper of general circulation in the City of St. Louis.

tenant's apartment. 456 U.S. at 445, 102 S.Ct. 1874. The issue before the Supreme Court was whether the statute, as applied to tenants in a public housing project, failed to afford those tenants "notice reasonably calculated, under all the circumstances, to apprise [them] of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 445, 449–450, 102 S.Ct. 1874 (internal quotations omitted). The Supreme Court stated that "in most cases, the secure posting of a notice on the property of a person is likely to offer that property owner sufficient warning of the pendency of proceedings possibly affecting his interests." *Id.* at 452, 102 S.Ct. 1874. Notwithstanding, under the circumstances and conditions of that case, the Court held that "merely posting notice on an apartment door does not satisfy minimum standards of due process" because process servers were aware that "notices posted on apartment doors in the area where these tenants lived were 'not infrequently' removed by children or other tenants before they could have their intended effect." *Id.* at 453–54, 102 S.Ct. 1874.

In this case, the inspector was responsible for inspecting properties, like Plaintiffs', that were located in the City's 11th Ward. Notably, the inspector was present when the copy of the notice was posted on the property. The inspector stated she was aware that squatters who wanted to live in condemned City properties would tear down boards and condemnation notices from the outside of those properties. She confirmed that "it wouldn't be unusual" for boards to be taken down from the properties, and that it was "quite common" for squatters or vandals to take down condemnation notices from the outside of properties immediately after she posted them as she was walking back to her car. Thus, like the process servers' testimony in *Greene*, the inspector's testimony dem-

onstrates that she was aware that notices posted on properties in the area where Plaintiffs' property was located were often removed by squatters or vandals before they had their intended effect. We find that this similarity in circumstances supports a finding that the City's posted notice was not reasonably calculated to reach Plaintiffs at the time of the attempted service.

Moreover, additional circumstances and conditions of this case, not present in *Greene*, also support a finding that the City's posted notice was not reasonably calculated to reach Plaintiffs at the time of the attempted service. In addition to her testimony set out above, the inspector confirmed that the City's records and photographs indicated that: (1) squatters took down boards from the outside of Plaintiffs' property; and (2) "at least two separate board-ups" of the property took place before the City posted notice on October 19, 2001. Based on the City's invoice for boarding materials, the inspector presumed that the first board-up took place on August 14, 2001. Additionally, the inspector confirmed that the City's photographs, which reflected that the property was not boarded-up as of October 4, 2001, but was boarded-up again as of October 19, 2001, indicated that a second board-up took place between October 4 and 19. The inspector's testimony demonstrates that prior to the posting of notice on the property, the City knew or should have known from its records and photographs that squatters, who often removed condemnation notices from other properties in the area, had been on the property and had removed boarding materials from the outside of the house. The City's posting of the condemnation notice despite having this knowledge at its disposal would not have been what someone desirous of actually informing Plaintiffs about the condem-

nation and potential demolition of their property would do to accomplish notice. *See Jones*, 547 U.S. at 229, 126 S.Ct. 1708 (stating that "when notice is a person's due . . . the means employed *must be* such as one desirous of *actually informing* the absentee might reasonably adopt to accomplish it") (internal quotations omitted) (emphasis added).

For the reasons stated above, we find that the City's posted notice was not reasonably calculated to reach Plaintiffs at the time of attempted service.

### b. The City's Mailed Notice did not meet the Requirements of Due Process

We now turn to whether the City's mailed notice was constitutionally sufficient. Under most circumstances, notice sent by mail is deemed reasonably calculated to apprise interested parties that their property rights are in jeopardy. *Weigner v. City of New York*, 852 F.2d 646, 650 (2nd Cir.1988). But in some special circumstances, mailed notice may be inadequate and due process may require the government to do something more than sending a letter to the address on file. *Id.* at n. 4. These special circumstances include: (1) where the government knows that an interested party does not reside at the mailing address and knows that the interested party could not have access to the address; (2) where the recipient is known to be a person who could not understand the mailed notice; and (3) where the government learns that the mailed notice is returned by the post office before the taking occurs. *Jones*, 547 U.S. at 223–239, 126 S.Ct. 1708; *Robinson v. Hanrahan*, 409 U.S. 38, 38–40, 93 S.Ct. 30, 34 L.Ed.2d 47 (1972); *Weigner*, 852 F.2d at 650 n. 4 (citing *Robinson*, 409 U.S. 38, 93 S.Ct. 30 and *Covey v. Town of Somers*, 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956)).

The third special circumstance, which is discussed in *Jones*, 547 U.S. at 223–239, 126 S.Ct. 1708, applies to this case.

In *Jones*, the U.S. Supreme Court examined whether, when notice of a tax sale is mailed and returned undelivered prior to a taking, due process requires the government to take additional reasonable steps to provide notice. *Id.* at 225–27, 126 S.Ct. 1708. The Court held in relevant part that:

> We do not think that a person who actually desired to inform a real property owner of an impending tax sale of a house he owns would do nothing when a certified letter sent to the owner is returned unclaimed. . . . [W]hen a letter is returned by the post office, the sender will ordinarily attempt to resend it, if it is practicable to do so. This is especially true when, as here, the subject matter of the letter concerns such an important and irreversible prospect as the loss of a house. Although the State may have made a reasonable calculation of how to reach [the property owner], it had good reason to suspect when the notice was returned that [he] was no better off than if the notice had never been sent. Deciding to take no further action is not what someone desirous of actually informing [the property owner] would do; such a person would take further reasonable steps if any were available.

*Id.* at 229–30, 126 S.Ct. 1708 (internal quotations and citations omitted).

The *Jones* Court then turned to whether there were any additional reasonable steps the government should and could have taken in that case, noting that: (1) it is not the Court's "responsibility to prescribe the form of service that the government should adopt"; (2) "if there were no reasonable additional steps the government could have taken upon return of the [letter], it cannot be faulted for doing noth-

ing"; and (3) "[w]hat steps are reasonable in response to new information depends upon what the new information reveals." *Id.* at 234, 126 S.Ct. 1708 (internal quotations omitted). The Court found that there were several reasonable additional follow-up measures that the government could have taken in that case when the certified letter was returned "unclaimed," including resending the notice by regular mail, posting the notice on the front door, and addressing otherwise undeliverable mail to "occupant." *Id.* at 234–35, 126 S.Ct. 1708. The Court also noted that the government's action in following up by publication was not constitutionally adequate under the circumstances because it was possible and practicable for the government to give the property owner more adequate warning of the impending tax sale. *Id.* at 237, 126 S.Ct. 1708.

*Jones* gives this Court guidance in determining whether the City's October 19, 2001 mailed notice met the requirements of due process under the circumstances and conditions of the instant case. As discussed below, the undisputed evidence demonstrates that the City became aware prior to the taking that its attempt at mailed notice failed.

First, there is undisputed evidence that Plaintiffs effectively notified the post office that they were changing their address from the Quincy address to the Cherokee address prior to date the City mailed its notice. By July 2001, mail addressed to Plaintiffs at the Quincy address was returned to the sender by the post office. Additionally, mail returned to sender bore a sticker which notified the sender of Plaintiffs' new Cherokee address. From July 2001 through July 2002, Plaintiffs received several pieces of mail at the Cherokee address that had been originally addressed to Plaintiffs at the Quincy address, including mail sent from City Divisions other than the Building Division.

The undisputed evidence also demonstrates that the City's October 19, 2001 notice mailed to Plaintiffs at the Quincy address was returned to the City by the post office and informed the City of Plaintiffs' new Cherokee address, and that the City took no further action to notify Plaintiffs. Prior to the demolition of Plaintiffs' property, the supervisor sent the Associate City Counselor Plaintiffs' condemnation file and a memorandum. The condemnation file sent by the supervisor to the Associate City Counselor included a copy of the October 19, 2001 condemnation notice mailed to Plaintiffs at the Quincy address. The supervisor's memorandum informed the Associate City Counselor that, "[a]ll letters were returned yet sent to owner of record." According to the supervisor's testimony, her statement to the Associate City Counselor that, "[a]ll letters were returned yet sent to owner of record" meant that, "all of the letters that were sent out by [her] office were returned," and "hadn't been sent on to the forwarding address at 3404 Cherokee. . . ." We find that the supervisor's testimony indicates the mailed notice was returned to the City and informed the City of Plaintiffs' new Cherokee address, and that the City took no further action to notify Plaintiffs.

Applying *Jones* to the facts of the instant case, we do not think that a person who actually desired to inform Plaintiffs of a condemnation and impending demolition would do nothing when the mailed notice was returned to the City and informed the City of Plaintiffs' forwarding address. Like the letter in *Jones,* the mailed notice in this case concerned the important and irreversible prospect of the loss of a home. The City may have made a reasonable calculation of how to reach Plaintiffs when it mailed the notice to the address on

record for Plaintiffs (the Quincy address). Nevertheless, when the notice was returned, the City had good reason to suspect that Plaintiffs were not any better off than if the notice had never been sent, especially in light of our finding in Section II(B)(2)(a) that the City's posted notice was not reasonably calculated to reach Plaintiffs at the time of attempted service. Deciding to take no further action is not what someone desirous of actually informing Plaintiffs would do; such a person would take further steps if any were available, including resending the letter if it was practicable to do so. In sum, because the undisputed evidence demonstrates that City became aware prior to the demolition that its attempt at mailed notice failed, due process required the City to take further reasonable steps if any were available. *Jones,* 547 U.S. at 225–239, 126 S.Ct. 1708.

In ascertaining whether there were further reasonable steps the City could have taken, we note that it is not our responsibility to prescribe the form of service that the City should adopt. *Id.* at 234, 126 S.Ct. 1708. The City can determine how to proceed in response to our Court's conclusion that notice was inadequate here. *Id.* at 238, 126 S.Ct. 1708. It suffices to say that there were steps the City could have taken that would have been more reasonably calculated to actually reach Plaintiffs, including resending the mail to Plaintiffs' Cherokee address. *See e.g., Conseco Finance Servicing Corp. v. Missouri Department of Revenue,* 195 S.W.3d 410, 418 n. 7 (Mo. banc 2006) (finding that attempting to obtain another address for property owners from government records or publishing the notice if no better method was identified would have been more reasonably calculated to actually reach the property owners than the government's single attempt to send a letter to an address it believed the property owners abandoned).

■ "While what alternatives are sufficient necessarily will vary, what will not vary is that … the [government] must use efforts reasonably calculated to reach the affected parties." *Id.* at 418. The City's mailed notice, which, prior to the demolition of Plaintiffs' property was returned to the City with a forwarding address for Plaintiffs, did not meet the requirements of due process.

### c. The Posted Notice Accompanied by Mailed Notice was not Constitutionally Sufficient

■ We recognize that in *Greene,* the U.S. Supreme Court stated that, "posted service accompanied by mail service *is constitutionally preferable* to posted service alone." 456 U.S. at 455 n. 9, 102 S.Ct. 1874 (emphasis added). However, the posted notice accompanied by mailed notice *was not constitutionally sufficient under the circumstances of this case* because: (1) the City's posted notice was not reasonably calculated to reach Plaintiffs at the time of attempted service; (2) the City became aware prior to the demolition that its attempt at mailed notice failed; and (3) there were steps the City could have taken that would have been more reasonably calculated to actually reach Plaintiffs. Accordingly, the City failed to provide Plaintiffs with notice, reasonably calculated under the circumstances, to apprise them of the condemnation and potential demolition of their property and afford them an opportunity to present their objections.

### 3. Conclusion

Plaintiffs were excused from exhausting their administrative remedies because the City failed to provide them with notice, reasonably calculated under the circumstances, to apprise them of the condemnation and potential demolition of their property and afford them an opportunity to

present their objections. Therefore, Plaintiffs' failure to exhaust their administrative remedies did not deprive the trial court of subject-matter jurisdiction. The trial court did not abuse its discretion in denying the City's motion to dismiss Plaintiffs' wrongful demolition claim for lack of subject-matter jurisdiction. Point denied.

### III. CONCLUSION

The trial court's judgment is affirmed.

KURT S. ODENWALD, P.J. and PATRICIA L. COHEN, J., concur.